NO. 4-04-0043     Filed: 9/7/06

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,   )   Appeal from
          Plaintiff-Appellee,           )   Circuit Court of
          v.                            )   Livingston County
MICHAEL J. SINGLETON,                    )   No. 03CF125
          Defendant-Appellant.          )
                                        )   Honorable
                                        )   Harold J. Frobish,
                                        )   Judge Presiding.
_____

          PRESIDING JUSTICE TURNER delivered the opinion of the

court:

          In November 2003, a jury found defendant, Michael J. Singleton, guilty of

burglary, theft over $300, animal torture, and aggravated cruelty to a companion animal.

In January 2004, the trial court sentenced defendant to concurrent, five-year prison

terms on the offenses of burglary and animal torture.

          On appeal, defendant argues (1) the State failed to prove him guilty

beyond a reasonable doubt, (2) the trial court erred in allowing the State to inform the

jury that a codefendant had pleaded guilty, and (3) statements made by two of the

State's witnesses were not admissible as impeachment.  We affirm.

## I. BACKGROUND

          In May 2003, a grand jury indicted defendant on three counts of burglary

(count I, III, and IV) and single counts of arson (count II), theft over $300 (count V),

animal torture (count VI), and aggravated cruelty to a companion animal (count VII).

Count III alleged defendant committed the offense of burglary on October 29, 2002,

when, without authority, he knowingly entered Scotty's Place, with the intent to commit a

theft therein. Count IV alleged defendant committed the offense of burglary on October 31, 2002, when, without authority, he knowingly entered Buck's Garage with the intent to commit a theft therein. Count V alleged defendant committed the offense of theft over $300 when he knowingly exerted unauthorized control over property of James Sewell with the intent to permanently deprive Sewell of the benefit of the property. Count VI alleged defendant committed the offense of animal torture in that defendant, without legal justification, tortured a dog by beating it about the head with a hammer or mallet so as to inflict extreme physical pain and motivated by the intent to increase or prolong the dog's pain. Defendant pleaded not guilty. The trial court severed counts I and II and proceeded to trial on counts III through VII.

In November 2003, defendant's jury trial commenced. Chris Gordon testified he and defendant broke into Scotty's Place in Pontiac on October 29, 2002, and then fled when the burglar alarm sounded. On October 31, 2002, Gordon and defendant entered Buck's Garage and found "power tools for working on cars." Gordon stated they put the tools in a box and put them in his car. Gordon stated a black or brown dog was in the garage walking around and barking. The dog "barked and growled a bit, at first," and after awhile it acted like it wanted to be petted. Gordon testified defendant hit the dog with a sledgehammer. He then "hung it from a chain." Gordon testified he left his car out in the country a few days later, walked to a farmhouse with defendant, and took a van. Gordon's car was later recovered and he was questioned about the tools.

Gordon testified he remembered being charged for the burglary of Buck's Garage but not Scotty's Place. He "vaguely" remembered talking to police officers in a

series of interviews about the burglaries. He also remembered court hearings concerning whether statements he made could be used against him. Defense counsel objected, stating the questioning was irrelevant and immaterial. The trial court overruled the objection, finding defense counsel invited the line of questioning. Gordon pleaded guilty to misdemeanor charges arising out of taking the van. He also received immunity from further prosecution as to the events at Buck's Garage and Scotty's Place as long as he testified truthfully in court.

On cross-examination, Gordon testified he went to retrieve his dad's car in the country but it was no longer there. He then called the police to report it stolen. The tools taken from Buck's Garage were in the back of the car. On redirect examination, Gordon testified he told the police about his involvement in the crimes and that of defendant as well.

John Crain testified he is defendant's brother. Defendant spent some nights at Crain's house in Bradley during October and November 2002. During that time, defendant mentioned being wanted in Pontiac and the police questioning him about a dog. Defendant mentioned he had been drinking and his friends beat a dog to stay quiet sometime in June "when we was [sic] out at Rock Creek swimming." The following exchange then occurred:

"Q. Did you tell some U.S. Marshals back on

February 6 of 2003 that I asked, he said he was drinking and

the dog wouldn't shut up, so his friends beat it to quiet it?

A. No. I told them a way bigger story than that, but

they told me only to write that.

Q. Did you write that?

A. Yes. I had to. They said they were going to put

me in jail and I was going to lose my job. I would be in

federal prison if I didn't."

The State asked Crain to identify People's exhibit No. 16 as the written statement he gave to the marshals on February 6, 2003.

On cross-examination, Crain acknowledged the statement and explained what defendant had told him about an incident with a dog.

"[Defendant] told me him and his friends go out drinking out

by a farm, out by a cornfield, they kick their lights off on their

car and sit there and they drink. And this dog from one of

the farmhouses kept coming out by the cornfield, and

barking and everything. So one of his buddies had chased

the dog off you know, kicking it, throwing a beer can at it or

whatever to get it to run back to the house so the people

wouldn't come out and catch them out there. Because they

would have been busted for drinking underage."

The trial court ruled the State was precluded from using Crain's prior statement as substantive evidence but was allowed to impeach him with the statement as to its reference to defendant having told Crain that his friends had previously beaten a dog.

Matt Mason testified John Crain called him in November 2002 asking for a ride because his car had run out of gas. Mason then picked up Crain and defendant at a hotel in Bradley. A discussion ensued, and defendant mentioned "they were trying to

put him in jail for killing a dog." Defendant denied it. The following exchange occurred:

"Q. Do you remember telling [an officer] that [defendant] told you that he had killed the dog, and you telling [defendant] that was stupid?

A. No.

Q. Do you remember--

A. I never told her that he told me that he did it.

Q. What did you tell her?

A. I told her that him and John told me that he was in trouble, that the cops were trying to put him in jail for it.

Q. Do you remember the business about that was stupid? Do you remember saying that?

A. For all the trouble he was in, I told him that he was stupid. And he needed to stay out of trouble.

* * *

Q. Okay. And you never said to the officers, to the agent that day, that he killed a dog, that [defendant] said he killed the dog by slamming a hammer through the dog's head?

A. No. That is a lie.

Q. Never said that when he told you that he killed the dog, you said that was stupid?

A. I never said that. I said he was stupid for being in

trouble, and he needed to stay out of trouble."

Pontiac police commander Roger Newsome testified he interviewed Matt Mason in February 2003.  During the interview, Mason stated defendant told him he had killed a dog by slamming a hammer through its head.  In November 2002, Newsome conducted a search of defendant's apartment and seized two T-shirts and a gray, hooded sweatshirt.

Livingston County deputy sheriff Marie Margherio testified that on October 31, 2002, "a distraught male, an elderly gentleman that was crying and shaking very badly," approached her vehicle and stated his business had been broken into and his dog had been killed.  The elderly gentleman, James Sewell, took her to Buck's Garage and showed her his dog Sadie suspended "from a log chain that was hanging up over the rafters."  Margherio noticed a hammer and a "large area of red fluid" on the floor.

James Sewell testified he runs a car-repair business out of Buck's Garage. In the evening of October 30, 2002, he returned to the garage to feed his dog Sadie. The next morning, Sadie did not meet him at the door.  Sewell turned on the lights and found Sadie hanging by a chain in the back room.

Sergeant Brian McCabe testified a car belonging to Chris Gordon's family was recovered by police.  Gordon's father came to pick up the car, opened the trunk, and found a large number of tools, some that did not belong to him.  He left those tools. Police officers ultimately determined the tools had been stolen from Buck's Garage. Officers then interviewed Chris Gordon about the tools.

Jennifer Ayers testified she is the Livingston County animal-control warden.  She removed Sadie from the chains, placed her in a bag, and took her to the

warden's facility. She then took hair and blood samples from the dog. She said Sadie was a border collie mix and had broken ribs and indentation markings that led her to conclude the dog "obviously had been beaten."

Glenn Schubert testified he worked as a forensic scientist with the Illinois State Police and specialized in the examination of human and animal hairs. He found a dog hair suitable for comparison taken from defendant's gray sweatshirt and compared it to the hair standard taken from Sadie. He concluded the hairs were "microscopically consistent" and could have originated from the same dog. Schubert stated he would put more weight on his conclusion because the hairs came from a mixed-breed animal, which has "more unique" characteristics than a purebred animal.

After the State rested its case, the trial court, over defendant's objection, read to the jury a summary prepared by the State of Chris Gordon's criminal cases. The trial court in Gordon's case granted his motion to suppress statements, and Gordon pleaded guilty to the offenses of criminal trespass to a vehicle (the stolen van) and theft (tools from Buck's Garage). The court sentenced Gordon to 158 days in jail on both offenses with 158 days' credit for time served. Gordon received immunity from further prosecution and was required to testify truthfully in the prosecution of defendant.

Joshua Crain testified he is defendant's half-brother as they share the same mother. Crain stated he saw defendant at Crain's apartment around 5 p.m. in the evening of October 30, 2002. Defendant stayed with him until 7:30 a.m. on October 31, 2002, when he called for a ride home.

Defendant testified on his own behalf and denied breaking into Scotty's Place and Buck's Garage. He also denied killing a dog. He testified he stayed at his

half-brother's house on October 30, 2002, until the next morning when his sister picked him up. Defendant pleaded guilty to criminal trespass to a van that occurred on Halloween night. He later traveled to Georgia to spend Thanksgiving with his grandmother. He was arrested on December 18.

Following closing arguments and several jury questions, the jury found defendant guilty of count IV (burglary of Buck's Garage), count V (theft over $300), count VI (animal torture), and count VII (aggravated cruelty to a companion animal) and not guilty of count III (burglary of Scotty's Place).

In December 2003, defendant filed a motion for a new trial and other posttrial relief. In January 2004, the trial court denied the motion. Thereafter, the court sentenced defendant to five years in prison on count IV and a concurrent sentence of five years on count VI. This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Defendant argues the State failed to prove him guilty beyond a reasonable doubt where the primary evidence against him was the testimony of an accomplice, no corroboration testimony was presented, and defendant presented an alibi defense. We disagree.

When reviewing a challenge to the sufficiency of the evidence in a criminal case, the relevant inquiry is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

People v. Ward, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 559 (2005). The trier of fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from that evidence. People v. Phelps, 211 Ill. 2d 1, 7, 809 N.E.2d 1214, 1218 (2004). A court of review will not overturn the verdict of the fact finder "unless the evidence is so unreasonable, improbable[,] or unsatisfactory that it raises a reasonable doubt of defendant's guilt." People v. Evans, 209 Ill. 2d 194, 209, 808 N.E.2d 939, 947 (2004).

The testimony of an accomplice witness has inherent weaknesses, and the trier of fact should accept it "only with caution and suspicion." People v. Tenney, 205 Ill. 2d 411, 429, 793 N.E.2d 571, 583 (2002). "Nevertheless, the testimony of an accomplice witness, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt." Tenney, 205 Ill. 2d at 429, 793 N.E.2d at 583.

Viewing the evidence in the light most favorable to the State, we conclude a rational trier of fact could have found defendant guilty of the charged crimes. Defendant's accomplice, Chris Gordon, testified that in the early morning hours of October 31, 2002, he and defendant entered Buck's Garage. Upon entry, the two found power tools and put them in a box. The box of tools ended up in Gordon's car. While inside the business, Gordon testified defendant hit the dog with a sledgehammer and

then hung it from a chain.

Gordon also testified that later in the week, Gordon, defendant, and two females were riding in Gordon's car. Gordon abandoned the car in the country, walked to a farmhouse with defendant, and took a van. Tiffany Hulbert testified she was riding in Gordon's car when it broke down. Defendant and Gordon went to a nearby house to borrow a van. After being stopped by police, defendant and Gordon fled. Police recovered Gordon's car, and Sewell identified the tools found in the car as the tools taken from the garage.

James Sewell testified he found his dog Sadie hanging by a chain. Jennifer Ayers found Sadie had broken ribs and markings indicating she had been beaten. Glenn Schubert compared hair standards taken from Sadie and a gray sweatshirt from defendant's residence and found them to be "microscopically consistent" and could have originated from the same dog. Schubert's conclusion was entitled to more weight, he contended, because the hairs came from a mixed-breed animal, which has "more unique" characteristics than a purebred animal.

The jury was well aware of Gordon's participation in the burglaries, his guilty plea, and the immunity he received in exchange for his truthful testimony. The trial court instructed the jury that accomplice testimony was subject to suspicion, should be viewed with caution, and should be carefully examined in light of the other evidence in the case. The jury had the responsibility to determine the credibility of witnesses and resolve conflicts in the evidence. A rational trier of fact could have found defendant committed the burglary of Buck's Garage and animal torture in connection with the death of Sadie.

Defendant, however, contends the evidence of his alibi defense outweighed the State's evidence. "Even if a defendant denies his guilt and the defense witnesses corroborate his alibi, his alibi defense does not, in and of itself, create a reasonable doubt of the defendant's guilt." People v. Liner, 356 Ill. App. 3d 284, 298, 826 N.E.2d 1274, 1288 (2005). "Juries may reject uncontradicted alibi witnesses [citations], and those whose testimony is contradicted. [Citations.] The familial ties of the alibi witnesses may bring their veracity under scrutiny such that their testimony may be rejected." People v. Garza, 92 Ill. App. 3d 723, 729, 415 N.E.2d 1328, 1334 (1981).

In the case sub judice, defendant's alibi witnesses were related to him. Joshua Crain is defendant's half-brother, Brandy Crain is his sister-in-law, and Terri Singleton is his sister. Moreover, Joshua and Brandy Crain did not come forward until shortly before trial. After being contacted by a private investigator, they claimed they were mistaken as to the dates the crimes were committed and once believed they had no testimony worth offering. Brandy testified the dates did not become important until she and her husband talked about and looked through his notes concerning the offenses. Her husband talked with someone and realized "he had his days wrong."

A reasonable jury could find the testimony of defendant's relatives was not credible and their delay in coming forward was to be viewed with skepticism. The credibility of the witnesses and the weight to be given to their testimony were matters within the province of the jury. A reasonable jury could have believed Gordon's testimony and not that of defendant or his alibi witnesses and found him guilty beyond a reasonable doubt.

## B. Gordon's Prior Convictions

Defendant argues the trial court erred in allowing the State to inform the jury that codefendant Gordon had pleaded guilty, contending the court failed to employ the balancing test set forth in People v. Montgomery, 47 Ill. 2d 510, 268 N.E.2d 695 (1971).  We disagree.

Whether evidence is relevant and admissible is a matter within the trial court's discretion.  People v. Ursery, 364 Ill. App. 3d 680, 686, 848 N.E.2d 146, 152 (2006). A court's decision as to the admissibility of evidence will not be disturbed absent an abuse of that discretion. Tenney, 205 Ill. 2d at 436, 793 N.E.2d at 586.

During opening statements, defense counsel stated that after being charged with the offenses, Gordon "made a deal" and was willing to "point the finger" at defendant and receive immunity for testimony against him.  Defense counsel indicated Gordon had "total immunity" and it "was only by coming up with the story about [defendant] that he walks scot free."  Further, all Gordon had to do was pick defendant as the perpetrator and "he walked free."

The State sought admission of certified copies of the common-law record in Gordon's criminal cases relating to the burglaries as found in People's exhibit Nos. 17, 18, 19, and 20.  The State argued defense counsel's opening statement asserted that Gordon was given immunity to "rat out" defendant.  The State contended it had a right to respond to the "misleading" characterization.

The trial court indicated the jury could be left with the reasonable impression that the State chose not to prosecute Gordon because he was going to "rat out" defendant.  The court indicated the State should have the opportunity to explain to

the jury that the prosecution of Gordon pertaining to the two burglaries ended because his statements were suppressed and a plea agreement was reached. The court refused to admit the exhibits but allowed a three-page summary of Gordon's case history prepared by the State to be read to the jury.

In this case, we find the trial court's decision to read the summary of Gordon's case histories was not an abuse of discretion. Defense counsel's opening statement left the jury with the impression that Gordon made a deal with the authorities to blame defendant for the crimes in exchange for immunity. Further, counsel intimated Gordon was given total immunity and walked away "scot free." Thus, defense counsel's argument invited a response from the State as to the accurate facts surrounding Gordon's criminal cases and testimony against defendant. Gordon was charged but did not plead guilty to criminal trespass and misdemeanor theft until after his inculpatory statements had been suppressed. Further, he did not get off "scot free," as he served 158 days in jail and received probation. The immunity he received was in exchange for providing truthful testimony against defendant. "[A] defendant cannot complain about a line of inquiry that he has invited." People v. Tolbert, 323 Ill. App. 3d 793, 805, 753 N.E.2d 1193, 1204 (2001). As the court found defense counsel's opening statements regarding Gordon invited the State's response, we find no abuse of discretion in the court's reading of the summary to the jury.

Defendant concedes this case "does not precisely fit as one involving impeachment under Montgomery." We agree and, based on the foregoing, we need not address that argument. Defendant also argues the State's closing argument exceeded the permissible use of a codefendant's guilty plea. However, defendant did not object at

trial or include this issue in his posttrial motion.  Thus, he has forfeited review of this issue on appeal.  See People v. Hestand, 362 Ill. App. 3d 272, 279, 838 N.E.2d 318, 324 (2005) (a defendant must object at trial and raise the issue in a posttrial motion to preserve the issue for review on appeal).

### C. Witness Statements as Impeachment

Defendant argues the statements made by Matt Mason and John Crain were not admissible as impeachment evidence because their testimony was not damaging to the State's case.  We disagree.

Under Supreme Court Rule 238(a) (188 Ill. 2d R. 238(a)), the credibility of a witness can be attacked by any party, including the party calling the witness.

"A court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party.  The reason for this is simple:  No possible reason exists to impeach a witness who has not contradicted any of the impeaching party's evidence, except to bring inadmissible hearsay to the attention of the jury.  Impeachment is supposed to cancel out the witness' testimony.  It is only when the witness' testimony is more damaging than his complete failure to testify would have been that impeachment is useful." People v. Weaver, 92 Ill. 2d 545, 563-64, 442 N.E.2d 255, 262-63 (1982).

ˇ 14 ˇ

Whether a witness' prior statement is inconsistent with his trial testimony is a matter within the discretion of the trial court.  People v. Billups, 318 Ill. App. 3d 948, 957, 742 N.E.2d 1261, 1269 (2001).

### 1. Mason Testimony

In this case, Matt Mason testified he picked up John Crain and defendant at a hotel and gave them a ride.  During the ride, defendant indicated he was being accused of killing a dog, but he denied doing it.  Mason claimed he never told the authorities that defendant committed the crime but was "stupid" for being in trouble.  Mason stated he never told officers that defendant had said he killed a dog by slamming a hammer through its head.

Commander Roger Newsome testified he listened to an interview of Mason that was conducted by an agent with the Bureau of Alcohol, Tobacco, and Firearms.  Mason stated during the interview that defendant had told him he killed a dog by slamming a hammer through its head.  Mason also stated he would not testify in court.

Here, we find it was proper for the State to impeach its own witness.  Mason's testimony that defendant denied killing the dog significantly damaged the State's case.  The jury was entitled to determine Mason's credibility by hearing the statements impeaching his testimony.  We find no abuse of discretion.

### 2. Crain Testimony

John Crain testified defendant came to his house in Bradley during the first two weeks of November 2002 because he was wanted in Pontiac.  When the State asked Crain whether defendant mentioned anything about a dog, Crain stated "not at

that time.  He told me that they were questioning him about a dog, but he didn't tell me anything about a dog."  Crain testified defendant had mentioned an incident around June regarding his friends beating a dog.  When asked if he told United States Marshals in February 2003 about that incident, Crain stated, "No.  I told them a way bigger story than that."  Crain asserted officers told him what to write.

The trial court found Crain was "all over the place" in his testimony.  The court found him to be a hostile witness and stated he had testified inconsistently with his prior statement.  The State was then allowed to impeach Crain with a redacted version of his prior statement that read:

"My brother Mike came to Bradley from Pontiac to lay low because of problems back home with the law[.]  While staying in Bradley[,] more rumors came up of a dog being killed and him being involved[.]  I asked[,] he said he was drinking[,] the dog wouldn't shut up so his friends beat it to quiet it."

Here, Crain testified defendant did not tell him anything about the dog the authorities sought to question defendant about.  Crain denied defendant ever told him he broke into a place in Pontiac or that he beat and killed a dog.  Crain's testimony exculpated defendant and was damaging to the State's case.  The trial court properly allowed the State to impeach Crain with his prior statement about defendant's involvement with beating the dog.  Thus, we find no abuse of discretion.

### 3. Closing Argument

Defendant contends the State exacerbated the alleged errors in closing

arguments by referring to the prior inconsistent statements as substantive evidence. However, defendant made no objection to this portion of the State's closing argument and did not raise the issue in his posttrial motion. Thus, he has forfeited review of this alleged error on appeal.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

APPLETON and MYERSCOUGH, JJ., concur.