2016 IL App (4th) 140137

**FILED**
May 3, 2016
Carla Bender
4th District Appellate
Court, IL

NO. 4-14-0137

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Macon County |
| TREMAINE ALLEN, | ) | No. 11CF1772 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Timothy J. Steadman, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court, with opinion.
Justices Steigmann and Appleton concurred in the judgment and opinion.

**OPINION**

¶ 1        In August 2013, a jury found defendant, Tremaine Allen, guilty of controlled

substance trafficking, unlawful criminal drug conspiracy, and unlawful possession of a

controlled substance with the intent to deliver.  In November 2013, the trial court sentenced

defendant to 30 years in prison.

¶ 2        On appeal, defendant argues (1) the State failed to prove him guilty beyond a

reasonable doubt and (2) his right to confrontation was violated.  We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        In December 2011, the State charged defendant with several drug-related counts.

Count I alleged defendant and Robert Castillo committed the offense of controlled substance

trafficking (720 ILCS 570/401.1 (West 2010)), alleging they knowingly and without lawful

authority caused to be brought into the State of Illinois 900 grams or more of a substance

containing cocaine with the intent to deliver that controlled substance. Count II alleged defendant committed the offense of unlawful criminal drug conspiracy (720 ILCS 570/405.1 (West 2010)), alleging he, with the intent that the offense of unlawful possession of a controlled substance with the intent to deliver be committed, agreed with Castillo and Saville McKnight to the commission of that offense in that they agreed to possess with the intent to deliver 900 grams or more of a substance containing cocaine and thereafter obtained 900 grams or more of a substance containing cocaine so that said possession with the intent to deliver could be made. Count IV alleged defendant and Castillo committed the offense of unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2010)), alleging they knowingly and unlawfully possessed with the intent to deliver 900 grams or more of a substance containing cocaine. Defendant pleaded not guilty.

¶ 5        In August 2013, defendant's jury trial commenced. Decatur police detective Chad Larner testified the street-crimes unit began investigating McKnight in 2011 based on information that he was trafficking "large amounts of cocaine" into Macon County. Officers also became aware of Keon Davis, who was distributing large quantities of crack cocaine in Decatur. A traffic stop of Davis revealed 35 grams of cocaine base and crack cocaine and a digital scale. Davis agreed to assist the police with their investigation of McKnight.

¶ 6        On November 12, 2011, officers from the Decatur police department and agents from the Drug Enforcement Administration (DEA) were monitoring McKnight's calls to Amtrak and Southwest Airlines regarding travel between Illinois and Texas. Larner learned defendant purchased an Amtrak ticket to travel from Dallas to St. Louis on November 13, 2011. Officers traveled to the train station in St. Louis, and Detective Jonathan Jones boarded the train and sat behind defendant. Larner and other officers then traveled to Springfield to see if defendant

exited the train. Larner stated defendant exited the train carrying a black nylon duffel bag and a black laptop bag. The train conductor later gave defendant a blue and white duffel bag from the luggage compartment.

¶ 7 Defendant left the train station via taxi and traveled to Decatur. Defendant exited the taxi at the home that his sister, Elise Allen, shared with McKnight. Wanting to know whether defendant had transported a large quantity of cocaine to Decatur from Texas for McKnight, Larner contacted Davis to arrange a meeting with McKnight. Larner equipped Davis with audio and video equipment and supplied him with $900. Davis's visit to McKnight's house was recorded, and the video and still images from the video were admitted into evidence and shown to the jury. At one point, the video showed two bags of a white powdery substance on a kitchen counter near where McKnight was using a microwave. The video showed McKnight wearing a surgical style mask while converting powder cocaine into crack cocaine. One of the images showed defendant standing in the doorway of the room adjoining the kitchen. Davis purchased cocaine from McKnight and provided the cocaine to the police.

¶ 8 Between November 13 and November 18, 2011, police officers intercepted conversations between McKnight and others. Larner decided to determine the location of defendant by "pinging" his cellular telephone. On November 18, 2011, Larner "pinged" defendant's phone and discovered the phone was in Atoka, Oklahoma. Larner was able to confirm defendant was traveling along a Greyhound bus route. Officers proceeded to St. Louis, where the bus was scheduled to arrive on November 19, 2011. Two officers identified defendant and maintained surveillance on him and his bags once he arrived in St. Louis. Larner stated officers were going to arrest defendant in Springfield for an outstanding warrant. Once the bus arrived in Springfield, officers boarded the bus and explained they were conducting a

transportation safety initiative. After defendant made a furtive movement, Larner drew his weapon and ultimately arrested him on an outstanding warrant for a traffic offense.

¶ 9　　　　　Upon questioning from Larner, defendant explained he was traveling with a blue and white duffel bag. Defendant stated he was responsible for all the contents inside the bag, packed it himself, and consented to a search of it. Upon inspection, Larner found a black duffle bag, which contained a pillow, a fleece blanket, and a manila envelope. When questioned about the envelope, defendant stated, "someone must have put it in there." Larner obtained a search warrant for the envelope. Inside, he found some dryer sheets and two cylindrical items, about the size of soda cans, covered in duct tape. Larner removed the duct tape, and a field test of the substance inside the packaging revealed the presence of cocaine.

¶ 10　　　　　Decatur police detective Scott Rosenbery testified he conducted surveillance at the bus station in St. Louis on November 19, 2011. Inside the terminal, Rosenbery observed defendant place a blue and white suitcase near the doors and walk away into the lobby area. During the time defendant left the bag unattended, Rosenbery never saw anyone else touch the suitcase. When defendant returned to the terminal after 10 to 20 minutes, he opened the suitcase before sitting down. Once the bus to Springfield arrived, defendant took possession of the suitcase and lined up to get on board. Rosenbery and another officer boarded the bus to conduct surveillance. Rosenbery stated officers arrested defendant when the bus reached Springfield.

¶ 11　　　　　Saville McKnight testified he had been convicted of conspiracy to possess a controlled substance with the intent to deliver in federal court and received a 40-year sentence. In 2011, McKnight began purchasing cocaine in Texas and transporting it back to Illinois. After one of McKnight's suppliers was raided by the police, an acquaintance, Carlos Martinez, contacted McKnight and stated he knew of another man, Robert "Chino" Castillo, who could

supply McKnight with cocaine. McKnight flew down to Texas and asked defendant for a ride. McKnight stated defendant thought he was buying clothes and, given that defendant saw him with a lot of money, defendant asked if there was any way he could make some extra money. After dropping off McKnight at Martinez's house, McKnight purchased cocaine from Castillo. McKnight stated Castillo wrapped the cocaine in duct tape. After calling defendant for a ride, McKnight told him he could earn $1,500 to $2,000 by transporting the package to Decatur. Defendant eventually arrived via taxi at McKnight's house in Decatur. McKnight removed the package from defendant's bag and "started messing with it." Davis then showed up to buy cocaine, but first McKnight had to cook the powder cocaine into crack cocaine.

¶ 12     A few days later, McKnight flew down to Texas. He wanted to purchase a kilogram of cocaine but only had $20,000. Given that McKnight was $5,000 short, Castillo "took some of the cocaine off." The cocaine was then wrapped in duct tape. McKnight called defendant and later told him he would pay him to transport another package to Decatur.

¶ 13     Robert Castillo testified he had been charged with calculated criminal drug conspiracy, unlawful possession of a controlled substance with the intent to deliver, and unlawful criminal drug conspiracy in the case involving defendant. By testifying, he hoped to receive consideration from the State. He stated McKnight purchased cocaine from him. He planned to rob McKnight once he earned his trust.

¶ 14     In November 2011, Castillo and Martinez arranged to meet with McKnight to sell cocaine. Castillo and McKnight met at the dealer's house. McKnight wanted to purchase a kilogram of cocaine but only had $20,000. The dealer then took off "about 100 grams off the kilo." Once the transaction was complete, McKnight called defendant to pick him up. Defendant came into the house with a gift bag, from which he pulled out condoms and gloves "to

wrap up the kilos." Once finished, defendant put the cylinders in the bag and left the house.

¶ 15       Richard Dollus, a member of the DEA, testified he participated in an investigation of McKnight in 2011. Dollus testified to several phone calls and text messages that took place between defendant and McKnight. After defendant was arrested in Springfield on November 19, 2011, Dollus allowed him to keep his phone while waiting to be interviewed in hopes he would contact McKnight. A text defendant sent to McKnight read: "Busted!!!!! Don't text back or call. In police station. Springfield." Later, when Dollus asked him about the manila envelope found in his suitcase, defendant said he did not know where it came from and someone must have put it in his bag when he was in St. Louis.

¶ 16        Robert Krefft, a forensic scientist with the DEA, testified as an expert in forensic chemistry. He stated Kristen Beer, a forensic scientist with the DEA, performed the analysis of the substances in this case. At the time of the trial, Beer was serving in Afghanistan with the United States Coast Guard. Krefft stated he reviewed her notes and reports as they related to the exhibits. Krefft then testified regarding how tests are conducted when exhibits are received. He stated the tests run by Beer were the same tests he would conduct and were regularly relied upon by experts in the field. In looking at exhibit No. 6 and the tests conducted on the contents, Krefft opined it consisted of 26.4 grams of crack cocaine. Exhibit No. 7A was 916.9 grams of a substance containing cocaine in powdered form.

¶ 17       Joseph Ambrozich, a fingerprint examiner with the DEA, testified his analysis of a plastic Baggie in the duct-taped packages did not reveal fingerprints belonging to defendant. Ambrozich was able to identify the latent prints as belonging to Castillo.

¶ 18       Anastasia Petruncio, a fingerprint specialist with the DEA, testified she examined exhibit No. 8, the manila envelope. She found two latent prints suitable for comparison. One

latent print came from defendant's left-hand ring finger. The other latent print came from defendant's right ring finger and the "interdigital" of his right palm.

¶ 19    Defendant testified in his own defense. He stated he was 38 years old and lived in Duncanville, Texas, with his wife at the time of his arrest. He worked at Wells Fargo Bank as a "tele-banker" and was in the process of getting a new job at Chase Bank. Defendant stated McKnight visited Dallas in October and November 2011 and defendant would pick him up and drop him off. Defendant traveled from Dallas to Springfield on or about November 12, 2011, via Amtrak to pick up a van to sell in Dallas. He brought a manila envelope to McKnight but he did not know what was inside. Defendant asked him if it contained drugs, and McKnight responded in the negative.

¶ 20    Defendant recalled another instance when he arrived at a house in Dallas and gave McKnight a box containing a food-saver, Teflon spray, and duct tape. Defendant stayed in the car while McKnight took the items inside and returned 10 to 15 minutes later.

¶ 21    McKnight gave defendant another envelope to carry from Dallas to Decatur. Defendant opened it and found a "large sum of money." Defendant took the money to the bank where he worked, and bank employees counted the money and completed a currency transaction report. Defendant planned to travel to Decatur to pick up the van. When he arrived at the Amtrak station, he saw "a lot of federal vehicles" and, because of his concerns with traveling with the large amount of cash, he decided to take the bus.

¶ 22    On the bus, defendant took his blue travel bag, which included a black bag, and two other bags. Police officers escorted him off the bus in Springfield. Detective Larner asked if he packed his bags, and defendant stated he did. When asked if the bag could be searched, defendant said, "Yes." Defendant stated the black bag had a pillow, a blanket, and the money.

He had checked in Tulsa and St. Louis to make sure the envelope containing the money was still there. When defense counsel asked how his finger and palm prints appeared on exhibit No. 8, the manila envelope from the black bag, defendant stated, "the only thing that I can go with is that I did reach my hand in St. Louis and in Oklahoma to touch the bag—the package to make sure it was there, the original package that I had." When Larner pulled out the envelope, defendant said, "That's not mine." Defendant then asked that it be opened because he wanted to see what it was. Larner declined, stating he wanted to obtain a search warrant. While he was in custody, defendant sent a text message to McKnight. He stated the "busted" text referred to being caught with the money.

¶ 23        Following closing arguments, the jury found defendant guilty on all counts. Thereafter, defense counsel filed a posttrial motion, arguing, *inter alia*, the State's evidence failed to prove defendant guilty beyond a reasonable doubt. On November 1, 2013, the trial court denied the motion. At the sentencing hearing, the State indicated counts II and IV merged with count I. The court sentenced defendant to 30 years in prison on count I.

¶ 24        After sentencing, the trial court directed the circuit clerk to file a notice of appeal on defendant's behalf. On November 6, 2013, defendant filed a *pro se* motion to reconsider his sentence. On November 8, 2013, the trial court entered an order striking the notice of appeal. On November 12, 2013, the circuit clerk filed a notice of appeal from the November 1, 2013, judgment. On February 3, 2014, the court conducted a hearing, wherein defense counsel indicated he did not wish to adopt defendant's *pro se* motion because the court imposed the minimum sentence. The court ordered the motion stricken because defendant was represented by counsel. The February 3, 2014, docket entry states, "Notice of Appeal reinstated." On February 20, 2014, the circuit clerk filed a notice of appeal. On February 28, 2014, appellate counsel filed

an amended notice of appeal, referring to February 3, 2014, as the date of judgment or order and indicating the appeal involved defendant's conviction, sentence, and the order striking the motion to reconsider the sentence.

¶ 25                                    II. ANALYSIS

¶ 26                                    A. Jurisdiction

¶ 27        Initially, we note the State argues this court is without jurisdiction over defendant's case, claiming his appeal was not timely filed. The State contends defendant's timely filed *pro se* motion to reconsider his sentence was a nullity because he was represented by counsel and the trial court erred in striking his original notice of appeal.

¶ 28        The filing of a notice of appeal is jurisdictional. Ill. S. Ct. R. 606(a) (eff. Mar. 20, 2009). Under Illinois Supreme Court Rule 606(b) (eff. Mar. 20, 2009), a notice of appeal must be filed within 30 days after the entry of the final judgment or within 30 days of the order disposing of a timely motion against the judgment. In a criminal case, a judgment is final when the defendant is sentenced. *People v. Jake*, 2011 IL App (4th) 090779, ¶ 24, 960 N.E.2d 45. To be timely, a motion directed against the judgment of sentence must be filed within 30 days of entry of the judgment. See *People v. Flowers*, 208 Ill. 2d 291, 303, 802 N.E.2d 1174, 1181 (2003). Illinois Supreme Court Rule 606(b) (eff. Mar. 20, 2009) provides, in pertinent part, as follows:

> "When a timely posttrial or postsentencing motion directed against
> the judgment has been filed by counsel or by defendant, if not
> represented by counsel, any notice of appeal filed before the entry
> of the order disposing of all pending postjudgment motions shall
> have no effect and shall be stricken by the trial court. Upon

striking the notice of appeal, the trial court shall forward to the appellate court within 5 days a copy of the order striking the notice of appeal, showing by whom it was filed and the date on which it was filed. This rule applies whether the timely postjudgment motion was filed before or after the date on which the notice of appeal was filed."

¶ 29 In the case *sub judice*, the trial court sentenced defendant to prison on November 1, 2013. Thus, defendant had 30 days to file his notice of appeal or a motion directed against the sentence. At the time of sentencing, defendant was represented by his attorney, Jon Noll. Counsel indicated defendant wished to appeal and noted by defendant's financial affidavit that he was without any assets. The State did not contest that defendant was indigent. The court directed the circuit clerk to file a notice of appeal on defendant's behalf and appointed the office of the State Appellate Defender to represent him.

¶ 30 On November 6, 2013, defendant filed a *pro se* motion to reconsider his sentence. On November 8, 2013, the trial court entered an order striking the notice of appeal because of the *pro se* motion. The State argues the court should not have struck the notice of appeal because defendant was represented by counsel at the time he filed his *pro se* motion. However, we find no evidence defendant was represented by counsel at that time. Defense counsel had indicated at sentencing that defendant was indigent, and the court appointed the appellate defender. Defendant's *pro se* motion noted service on the court and the State's Attorney's office but not to defense counsel. Thus, the State has failed to establish defendant was represented by counsel when he filed his timely *pro se* motion. Accordingly, there is no support for the State's argument that defendant's motion should have been immediately stricken by the court.

¶ 31    While defense counsel appeared on February 3, 2014, and the trial court ordered the *pro se* motion stricken because defendant was represented by counsel, we find defendant's *pro se* motion tolled the time for filing the notice of appeal. Thus, as the notice of appeal was timely filed on February 20, 2014, we have jurisdiction over this appeal.

¶ 32                    B. Sufficiency of the Evidence

¶ 33    Defendant argues the State failed to prove he knew the item he transported from Texas to Illinois contained a controlled substance. We disagree.

¶ 34    " 'When reviewing a challenge to the sufficiency of the evidence in a criminal case, the relevant inquiry is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ngo*, 388 Ill. App. 3d 1048, 1052, 904 N.E.2d 98, 102 (2008) (quoting *People v. Singleton*, 367 Ill. App. 3d 182, 187, 854 N.E.2d 326, 331 (2006)). The trier of fact has the responsibility to determine the credibility of witnesses and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence. *People v. Jackson*, 232 Ill. 2d 246, 281, 903 N.E.2d 388, 406 (2009). "[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable[,] or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98, 890 N.E.2d 487, 496-97 (2008).

¶ 35    In this case, the trial court entered a conviction against defendant on the offense of controlled substance trafficking. Section 401.1(a) of the Illinois Controlled Substances Act (Act) (720 ILCS 570/401.1(a) (West 2010)) provides as follows:

    "Except for purposes as authorized by this Act, any person who

    knowingly brings or causes to be brought into this State for the

purpose of manufacture or delivery or with the intent to manufacture or deliver a controlled substance other than methamphetamine or counterfeit substance in this or any other state or country is guilty of controlled substance trafficking."

"To sustain a charge of controlled substance trafficking, the State must prove that the defendant, with knowledge, brought into this state a controlled substance for the purpose of delivery or with the intent to deliver." *People v. Rosenberg*, 356 Ill. App. 3d 219, 220, 825 N.E.2d 720, 722 (2005). The Act defines a "controlled substance" as "a drug, substance, or immediate precursor in the Schedules of Article II of this Act." 720 ILCS 570/102(f) (West 2010). Defendant argues the State failed to prove he knew the item he was transporting from Texas to Illinois was a controlled substance.

¶ 36 The evidence in this case indicated McKnight began purchasing cocaine in Texas in 2011. Initially, he would drive down to Texas and bring back the cocaine himself. Eventually, he looked into finding others to take the cocaine to Illinois. On one occasion, McKnight arrived in Texas and asked defendant for a ride from the airport. Defendant dropped him off at Martinez's house and left. Castillo arrived at the house with 27 ounces of cocaine, and Martinez wrapped the cocaine and duct-taped it. Once the transaction was complete, McKnight called defendant for a ride. On the ride to the hotel, defendant expressed interest in earning some money. McKnight handed him a package and told him he would pay him $1,500 to $2,000 plus travel expenses to bring it to Decatur.

¶ 37 Defendant took the package and traveled to Decatur. Upon his arrival, McKnight took the package and began cooking the powder cocaine into crack cocaine. Defendant was in the house at the time, and the informant's video showed defendant in the kitchen doorway while

McKnight was cooking the cocaine.

¶ 38    A few days later, McKnight returned to Texas and had Castillo pick him up at the airport. They went to a house, and McKnight stated he was looking to buy a kilogram of cocaine. He only had $20,000, so Castillo cut off a chunk from one of the cylinders. According to McKnight, Castillo wrapped the cylinders in duct tape to disguise the smell. Once complete, McKnight called defendant to give him a ride. McKnight handed the items to defendant and told him he would pay him to bring them back to Decatur. McKnight testified the packages he gave to defendant on these two occasions did not contain cash.

¶ 39    According to Castillo, defendant had entered the house with a birthday gift bag. He claimed defendant plugged in a food-saver and removed condoms and gloves from his bag. Castillo admitted handling the plastic bag that was put on the cocaine after the chunk was removed. He stated he saw defendant and McKnight wrapping the cocaine and defendant carrying the bag outside.

¶ 40    Police officers were able to determine that defendant was scheduled to arrive in St. Louis via bus on November 19, 2011. During the layover in St. Louis, defendant left his blue and white bag unattended for several minutes. When he returned to the bag, he reached inside and maneuvered something around. Upon his apprehension in Springfield, defendant's bag contained the manila envelope containing two cylindrical objects with duct tape on the outside. While in custody, defendant sent a text message to McKnight that he had been "busted." Fingerprint experts found Castillo's fingerprints on a plastic bag and defendant's prints on the manila envelope.

¶ 41    The evidence in this case supports the jury's conclusion that defendant knowingly brought cocaine into Illinois. "Knowledge may be, and ordinarily is, proven circumstantially."

*People v. Ortiz*, 196 Ill. 2d 236, 260, 752 N.E.2d 410, 425 (2001).  Here, the jury heard testimony that the drug-buying McKnight wanted to pay large sums of money to hand deliver packages to Illinois.  Defendant, looking to make some money, took him up on the offer.  Defendant's claim that he did not know McKnight was in the drug business is not credible considering McKnight proceeded to cook the cocaine with defendant in the house shortly after defendant returned to Decatur after his first trip.  Further, following his arrest, defendant sent the text message that he had been "busted" to McKnight, and the jury could rationally conclude defendant knew he had been "busted" for transporting the cocaine into Illinois.

¶ 42       On appeal, defendant focuses much of his argument on Castillo and McKnight and their lack of credibility.  The jury was well aware of the two drug dealers' criminal histories and their hopes for consideration from the state or federal government in testifying against defendant.  In his brief, defendant points out inconsistencies in Castillo's and McKnight's testimony regarding defendant's presence at the packing of the cocaine.  However, their testimony was such that the jury could find the package of cocaine defendant received in Dallas was the same package the police retrieved from his bag in Springfield.

¶ 43       Defendant also points out Castillo's fingerprints were found on the packing material and the absence of prints from defendant and McKnight on that material showed Castillo packed the cocaine and lied about defendant taking part.  However, the evidence indicated gloves were in the bag of packaging supplies defendant brought to the house in Dallas.  Also, Ambrozich stated he expected to find a print suitable for comparison on "maybe one in ten packages" like the duct-taped cylinders and he did not retain records of any partial prints unsuitable for comparison that may have been on the duct tape.  Even if Castillo did all of the packaging of the cocaine, a jury could still conclude based upon the evidence that defendant

knew what the duct-taped cylinders contained as he traveled to Illinois.

¶ 44        At trial, defendant's arguments would have the trier of fact believe he was nothing more than an unwitting dupe or a "blind mule" who had no idea what he was transporting to Illinois.  However, defendant's own testimony showed his story was highly questionable.  Defendant claimed the second package contained $10,000 in cash, which he took to the bank to be counted.  He testified he put the money in a small manila envelope, which was smaller than the manila envelope in exhibit No. 8.  He claimed to have checked his bag in Tulsa and St. Louis to see if the money was still inside, which he states explained the presence of his prints.  On cross-examination, defendant insisted that four pairs of pants, four shirts, and a pair of tennis shoes had been taken from his bag.  The following exchange between the prosecutor and defendant also occurred:

"Q.  So now you're telling me that somebody then must have gotten in your bag, removed your clothes, took the $10,000 cash envelope, put the envelope with cocaine in it, and wrapped it all back up in your fleece blanket, put your pillow back on top, put it all back in your blue bag.  That's what you're telling me?

A.  I don't know what that is and how it got there is what I'm telling you.

Q.  When would this have happened?

A.  I'm not certain of that either.

Q.  Well, your bag you put—you packed your bags?

A.  I'm going to say St. Louis.  It could have been between Tulsa and St. Louis.

Q. Well, between Tulsa and St. Louis, your bag is under a bus moving?

A. When you make stops and get off, I mean, you can touch anyone's bags. I could go into anyone's bag if I wanted to.

\* \* \*

Q. Can you think of any reason why someone you didn't know would place cocaine in your luggage?

A. As time went on—and I've had time to sit here and think all the time that I've been sitting here. I'm thinking—like Saville told you, I had no knowledge of drugs. So what I'm thinking is when he gave me the money, maybe he gave me the wrong package not knowing that I was going to open it, or something, so I don't know if Castillo—like I said, I've never met him—possibly put it in. I have no idea. That's the only scenario I can even come up with. Maybe they made a mistake, the people who were putting these things on me illegally.

\* \* \*

Q. So your theory is that because you opened the envelope that had cash in it, that there was somehow a mistake, that you found out that there was cash, so somebody, maybe Robert Castillo, in St. Louis, where he would have potentially had an opportunity, took the money envelope and replaced it with the cocaine envelope?

- 16 -

A.  A possibility.  I don't know.  I mean, I don't know.  I

don't have the facts of how it got there, so I—anything that I say is

going to be an allegation, speculation.  It's going to be made up.

So I don't know."

Given that police had defendant's bag under surveillance in St. Louis and nobody entered it but

him, his claim that somehow someone replaced an envelope containing $10,000 in cash with an

envelope full of cocaine lacks all credibility.  Considering the totality of the evidence, and as the

jury was responsible for determining the credibility of the witnesses, resolving conflicts in the

evidence, and drawing reasonable inferences therefrom, we find the jury could reasonably

conclude defendant knowingly brought cocaine into Illinois and committed the offense of

controlled substance trafficking beyond a reasonable doubt.

¶ 45                               C. Confrontation Clause

¶ 46          Defendant argues his sixth amendment right to confrontation (U.S. Const. amend.

VI) was violated when Krefft was allowed to testify about the results of a chemical analysis

performed by another chemist who did not testify at trial.  The State argues defendant has

forfeited review of the issue by failing to object at trial to the limitation of Krefft's involvement

in the testing procedures.  Moreover, defendant did not raise the issue in his posttrial motion.  By

failing to object at trial and raise the issue in a posttrial motion, the issue is forfeited on appeal.

See *People v. Hestand*, 362 Ill. App. 3d 272, 279, 838 N.E.2d 318, 324 (2005) (a defendant must

object at trial and raise the issue in a posttrial motion to preserve the issue for review).

Defendant, however, asks this court to review the issue as a matter of plain error.  Based on a

review of the record, we find plain-error review inappropriate.

¶ 47          The plain-error doctrine allows a court to disregard a defendant's forfeiture and

consider unpreserved error when either:

> "(1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Wilmington*, 2013 IL 112938, ¶ 31, 983 N.E.2d 1015.

¶ 48 Under both prongs of the plain-error analysis, the burden of persuasion remains with the defendant. *Wilmington*, 2013 IL 112938, ¶ 43, 983 N.E.2d 1015. As the first step in the analysis, we must determine whether any error occurred at all. *People v. Taylor*, 2011 IL 110067, ¶ 30, 956 N.E.2d 431. "If error did occur, we then consider whether either prong of the plain-error doctrine has been satisfied." *People v. Sykes*, 2012 IL App (4th) 111110, ¶ 31, 972 N.E.2d 1272.

¶ 49 The confrontation clause in the sixth amendment to the United States Constitution, which applies to the states through the fourteenth amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amends. VI, XIV; *People v. Barner*, 2015 IL 116949, ¶ 40, 30 N.E.3d 271. "Confrontation errors are constitutional violations, but, as with other rights a defendant holds, he or she may waive such a right." *People v. Hood*, 2014 IL App (1st) 113534, ¶ 18, 19 N.E.3d 1244. Moreover, "defense counsel may waive a defendant's right of confrontation as long as the defendant does not object and the decision to stipulate is a matter of trial tactics and strategy." *People v. Campbell*, 208 Ill. 2d 203, 217, 802 N.E.2d 1205, 1213 (2003).

¶ 50    Our supreme court has noted that, "[a]s a matter of trial strategy, defense counsel might choose to stipulate to evidence in an effort to minimize the adverse impact it will have at trial." *People v. Phillips*, 217 Ill. 2d 270, 284, 840 N.E.2d 1194, 1203 (2005). In *Phillips*, 217 Ill. 2d at 276, 840 N.E.2d at 1198, defense counsel indicated he had no objection to lab reports wherein certain quantities of cocaine and cannabis were documented. The court surmised, "to contest the results of chemical testing, without a basis for doing so, would have simply highlighted testimony regarding the nature of the drug and would have unduly magnified its importance, when defendant was better served by focusing the jury's attention on the critical issue of whether defendant knowingly possessed the controlled substance." *Phillips*, 217 Ill. 2d at 285, 840 N.E.2d at 1203; see also *People v. Woods*, 214 Ill. 2d 455, 474, 828 N.E.2d 247, 259 (2005) (stating "it may be reasonably assumed that defendant's trial counsel decided to forgo the opportunity to cross-examine the expert in order to focus on other theories of the defense"); *People v. Scott*, 355 Ill. App. 3d 741, 745, 824 N.E.2d 302, 307 (2005) (stating defense counsel's decision not to contest the lab report by calling the chemist did not amount to a confrontation violation because "[d]oing so could have confused the jurors and distracted them from defendant's defense").

¶ 51    Here, as stated, defense counsel did not object to Krefft's testimony regarding Beer's report. Counsel did not stipulate to the introduction of the evidence, either. However, the decision not to object to Krefft's testimony may have been a matter of trial strategy. We find it inappropriate to engage in plain-error review when the issue at hand may have been a strategic decision by counsel not to focus the jury's attention on the weight and content of the substances tested, *i.e.*, more than 900 grams of cocaine, but instead on whether defendant knowingly possessed the cocaine. Moreover, "if 'those trial tactics are to be the subject of scrutiny, then a

record should be developed in which they can be scrutinized.' [Citation.]" *In re Carmody*, 274 Ill. App. 3d 46, 56, 653 N.E.2d 977, 984 (1995). Whether counsel was deficient in his strategy and whether defendant was prejudiced as a result are matters best left for proceedings under the Post-Conviction Hearing Act (725 ILCS 5/122-1 to 122-7 (West 2014)).

¶ 52                                  III. CONCLUSION

¶ 53        For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $75 statutory assessment against defendant as costs of this appeal.

¶ 54        Affirmed.