# Illinois Official Reports

## Appellate Court

---

### *People v. Djurdjulov*, 2017 IL App (1st) 142258

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOVAN DJURDJULOV, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-14-2258 |
| Filed | September 12, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-6463; the Hon. Lawrence Edward Flood, Judge, presiding. |
| Judgment | Vacated and remanded. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Darren E. Miller, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE NEVILLE delivered the judgment of the court, with opinion.<br>Justice Hyman concurred in the judgment and opinion.<br>Justice Mason concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1      A jury found Jovan Djurdjulov guilty on two counts of first degree murder. Djurdjulov argues on appeal that the trial court should have suppressed the statements he made to police, and the court should have granted Djurdjulov's request for fees so that he could hire an expert to analyze cell phone records the prosecution used at trial. We find Djurdjulov's statements admissible, but we hold that the court should have granted Djurdjulov's request for expert witness fees. Accordingly, we vacate the convictions and remand for a new trial.

¶ 2      BACKGROUND

¶ 3      The Spanish Cobras gang and the Spanish Gangster Disciples (SGD) gang fought for control of areas in Chicago early in 2009. On January 30, 2009, a thrown glass bottle shattered a window in the home of Djurdjulov, a member of the Cobras. Around 1 a.m. on January 31, 2009, a fire started raging through a three-story apartment building on Argyle Street, near Pulaski Road. Members of the SGD lived on the second and third floors of the burned building. Rosanna Ocampo and her daughter, Itzel Fernandez, who lived on the second floor of the building, died from inhaling smoke from the fire. Firemen at the scene smelled gasoline in the building. Police recovered debris from the scene and sent it to a lab to test for accelerants.

¶ 4      Police sought to question some members of the Cobras about their whereabouts at the time the fire started. After 6 p.m. on January 31, 2009, a security guard at Roosevelt High School contacted police when he saw Djurdjulov and two other Cobras enter the high school to watch a show in the auditorium. Police officers came into the auditorium and escorted Djurdjulov, Ulices Gomez, and Jamale Hernandez to three waiting police cars that took the three Cobras to the police station for questioning. Djurdjulov told police that he had visited Michael and Noel Santiago shortly after midnight that morning, and he had heard that Franco Avila, another Cobra, set the fire. Police released Djurdjulov, Gomez, and Hernandez.

¶ 5      Police again picked up Djurdjulov on February 15, 2009. To check his alibi, they asked him to show them where he was at the time of the fire. He directed police to the area and pointed out the Santiagos' home.

¶ 6      Police arrested Djurdjulov on March 10, 2009, in connection with an incident unrelated to the fire. Djurdjulov remained in an interrogation room at the station for about 36 hours, where police questioned him about the fire. Police recorded the questioning. Djurdjulov eventually said that David Vasquez, a former member of the SGD, started the fire, and Vasquez asked Djurdjulov to act as a lookout. Prosecutors charged Djurdjulov with two counts of first degree murder.

¶ 7      Pretrial Proceedings

¶ 8      Djurdjulov moved to suppress the statements he made to police on January 31, February 15, and March 10 to 12, 2009. The trial court heard testimony from police officers and other persons who saw police with Djurdjulov in the high school. The court concluded that Djurdjulov voluntarily went with police to the police station and voluntarily answered questions about his whereabouts at the time the fire started. The court also found that Djurdjulov voluntarily accompanied police on February 15, 2009. The court watched the

recording of Djurdjulov's time in custody from March 10 to March 12, 2009. The court found Djurdjulov's statements voluntary. The court denied the motion to suppress the statements.

¶ 9 Djurdjulov expected police to use cell phone records as evidence at the murder trial. Defense counsel filed a motion asking the court for funds so that Djurdjulov could pay an expert to analyze the cell phone records and help with cross-examination of the prosecution's cell phone expert. At the hearing on the motion, Djurdjulov testified that he owned no bank accounts, no car, no valuable items like electronics or jewelry, no home or land, no business, and no assets he could use to pay for an expert. Djurdjulov testified that his aunt paid the fees of his privately-retained attorney. The State offered no evidence to challenge the credibility of Djurdjulov's assertions about his assets.

¶ 10 The trial court noted that it had no basis for rejecting defense counsel's assertion that he needed an expert to contest the cell phone evidence. The trial court said:

"[Djurdjulov has] been represented by privately-retained attorneys for the last four years. He in fact may be indigent, but someone's been paying the bills for his representation.

It would seem to me if the issue is the expert fees for the defense of the case, in light of the fact that persons *** have been providing funds to represent him in the case so far, that the issue is is that person able to pay for the expert fees."

¶ 11 The court denied the request for fees.

¶ 12                                   Trial

¶ 13 The prosecution presented an expert who testified that gasoline permeated the debris police found at the fire. The prosecution admitted that police found no useful fingerprints at the scene. No witness claimed to have seen who set the fire, and no witness claimed to have seen Djurdjulov near the apartment building near the time the fire started.

¶ 14 Michael Santiago testified that in 2009, he lived near Cicero Avenue and Lawrence Avenue in an apartment he shared with his brother Noel, Angelita LaSalle, who was Michael's fiancée, and Vivian Quesada, Noel's girlfriend. Noel and Michael belonged to the Cobras. Michael said that on January 31, 2009, Noel came home from work around 1:30 a.m. and told Michael, LaSalle, and Quesada that Djurdjulov was coming to visit. Djurdjulov arrived a few minutes later, stinking of gasoline. Djurdjulov went back out and returned carrying jeans and accompanied by Gomez. Djurdjulov went to a bathroom where he changed his clothes. After 2 a.m., Djurdjulov, Michael, Noel, and Gomez went to buy alcohol. Noel alone went into the liquor store. While Michael, Djurdjulov, and Gomez waited in Gomez's car, Michael complained that the car smelled like gasoline. Djurdjulov said, "I burned down a building." After they returned to Michael's home, they saw on television a news report about the fire on Argyle, about a mile from Michael's home. Djurdjulov said, "That's what I did." Later that morning, Michael found Djurdjulov's gasoline-soaked pants in Michael's bathroom. Michael put the pants in the garbage.

¶ 15 Michael admitted that when he first spoke with police about the fire, he lied, telling them he did not know Djurdjulov. The second time he spoke with police, he did not tell them Djurdjulov smelled of gasoline or that he confessed to the crime or any other incriminating facts. Michael testified that police arrested him on March 17, 2009, and told him someone had identified him as a shooter in an incident unrelated to the fire. Police questioned Michael about

the fire and not about the shooting. He told them that Djurdjulov said he set the fire. Prosecutors never charged Michael in connection with the shooting incident.

¶ 16    The parties stipulated that Michael told an investigator working for defense counsel that Djurdjulov had not smelled like gasoline on January 31, 2009. The parties stipulated that Michael also said to the investigator that during the questioning in March 2009, police told Michael that they would release him from custody if he said what police wanted to hear about Djurdjulov. Michael testified that he lied to the defense investigator.

¶ 17    LaSalle testified that on January 31, 2009, Noel came home around 1 a.m. Djurdjulov came to visit around 2 a.m., smelling of gasoline. LaSalle corroborated Michael's testimony about Djurdjulov leaving and returning with Gomez and a change of clothes. She also corroborated the testimony that Djurdjulov, Gomez, Michael, and Noel went out to buy alcohol and later that morning Michael discarded clothes Djurdjulov left in the bathroom.

¶ 18    LaSalle admitted that when she first spoke to police about the night of January 31, 2009, she said Djurdjulov arrived before midnight on January 30, 2009, and stayed most of the night. She changed her account completely after police arrested Michael. Like Michael, LaSalle told the defense investigator that police said they would release Michael if she and Michael agreed to the police's account of the morning of January 31, 2009. Also like Michael, LaSalle testified that she lied to the defense investigator.

¶ 19    Quesada testified that on January 31, 2009, Noel came home around 1 a.m. and, about 10 minutes later, Djurdjulov arrived. Otherwise, she echoed LaSalle's testimony, including initially lying to police and changing her story after police arrested Michael on the shooting charge. Over defense counsel's objections to prior consistent statements, the court permitted Michael, LaSalle, and Quesada to recount both what they said to police after Michael's arrest and to say that their testimony to the grand jury the day after Michael's arrest matched the testimony they gave in court about Djurdjulov's appearance and confession on January 31, 2009.

¶ 20    The parties stipulated to the accuracy of cell phone records. The police officer who obtained the records testified: "cell providers *** explain[ed] some of the items that were on there I didn't understand. Actually, they're quite confusing sometimes."

¶ 21    Joseph Raschke of the Federal Bureau of Investigation testified that the numbers in the record identified the cell phone that made each call, the cell phone that received the call, and the cell phone towers that transmitted the signals to and from those cell phones. From the location of the tower that transmitted the call, Raschke could approximate the location of the cell phone, within a radius of one or two miles. Records for Avila's phone showed that he made and received several calls after midnight on January 31, 2009, and all used the tower nearest to Avila's home. Calls from Djurdjulov's phone at 12:53 a.m. and 1:06 a.m. used a tower only two blocks from the fire. A call at 1:12 a.m. used a tower near Cicero Avenue and Peterson Avenue. According to Raschke, the calls showed that Djurdjulov was near the scene of the fire when the fire started, and he left the area soon thereafter.

¶ 22    On cross-examination, Raschke admitted that obstructions, or damage to a tower, can affect which tower transmits a call. Raschke did not check for obstructions or damage to towers in the area of the fire and surrounding neighborhoods.

¶ 23    The prosecution then played for the jury extended portions of the questioning of Djurdjulov on March 10 to March 12, 2009. At first, Djurdjulov told police that Avila called

- 4 -

him on January 30, 2009, and told Djurdjulov that Avila intended to get revenge on SGD. After the fire, Avila spoke to Djurdjulov again and said he used Heet to set the fire. Detectives told Djurdjulov that his account did not fit with cell phone records. Djurdjulov repeated his assertion that he did not go to the scene of the fire until he stopped with Gomez and the Santiagos on the way to the liquor store, around 2:30 a.m. on January 31, 2009. Detectives said:

> "Your own cell phone puts you there. ***
>
> *** Everything is point[ing] to you and saying you're there and you're still denying it. And no one's gonna believe your story ***. *** [I]f you say that Franco did the fire you were there with Franco or you knew what Franco was gonna do and you need to come clean who was involved in it, and that is it. Because you were there and that's you[r] way out. I was there I didn't know what they were gonna do there's your way out."

¶ 24        After about 24 hours in custody, including 6 hours of questioning, and significantly after detectives told Djurdjulov about the cell phone records, Djurdjulov changed his account and said he saw the fire when it started. Djurdjulov said he went with Gomez around midnight to drop off some friends with whom they had spent the evening. After they dropped the others off, Djurdjulov needed to urinate. Gomez parked and Djurdjulov got out of the car. He went into an alley to urinate. He saw an empty bottle, near a building where he knew SGD lived. He decided to throw the bottle through the window of the home. As he got to the building, he saw the fire starting and he saw Avila leaving the building. Detectives said someone must have helped Avila. Djurdjulov said he saw a second person in a hoodie leaving with Avila, but he did not recognize that person.

¶ 25        Detectives told Djurdjulov that Avila's cell phone records showed that Avila stayed home that night. Djurdjulov said he saw Avila around 7 p.m. on January 30, 2009, several hours before a bottle came through the window of Djurdjulov's home, and Avila said he intended to get revenge on SGD because they shot at him. Detectives emphasized that the cell phone records made the account unbelievable.

¶ 26        Some hours later, Djurdjulov changed his account again. He said Vasquez, formerly an SGD, set the fire. Djurdjulov said Avila did not come to the scene at all. Djurdjulov saw Vasquez in Cobras territory on January 30, 2009. Vasquez told Djurdjulov to meet him near the SGD home on Argyle at 1 a.m. so Djurdjulov could watch Vasquez burn it. Police said that Vasquez must have needed someone to look out for police and SGD. Djurdjulov said that Vasquez asked him to act as a lookout, and he agreed.

¶ 27        Over the course of about 36 hours in the interrogation room from March 10 to March 12, 2009, in about 8 hours of questioning, the detectives who interviewed Djurdjulov frequently accused him of lying and frequently yelled at Djurdjulov. At one point, a detective said:

> "[O]h this fucking make[s] you smirk, huh? Your little smirk, a seven-year-old girl is dead. You think this is a fucking joke? ***
>
> ***
>
> *** What do you think they're gonna do to you? You'll be in the fucking penitentiary until you're fucking a hundred and ten fucking years old if you make it that far. That's if they don't fucking give you the fucking lethal injection. ***
>
> * * *

- 5 -

*** [Y]ou could very well spend the rest of your fucking life in prison if they don't fucking give you the needle? I mean you realize that? *** For something that might've been a fucking mistake, might've been a plan that went to[o] far. But we won't know that until you tell us exactly what happened, who was there, how it went down."

¶ 28    Detectives told Djurdjulov that the cell phone records showed his phone exchanging texts with Gomez's phone. They said his story, that Gomez dropped off some friends with Djurdjulov in Gomez's car and then they went to the Santiagos' home, made no sense because he would not send text messages to Gomez while riding in Gomez's car. The detectives also told Djurdjulov that his cell phone records showed a call to Camacho, another Cobra, around 1 a.m. Djurdjulov continued to insist that he did not call Camacho any time near 1 a.m., and Djurdjulov had ridden in Gomez's car after midnight and then went with Gomez to the Santiagos' home around 1 a.m. Djurdjulov said that when he went to meet Vasquez at the arranged spot before 1 a.m., Gomez parked and Djurdjulov got out of the car without telling Gomez about the arranged meeting. Djurdjulov also said, consistently, that he did not tell Gomez about the fire when he returned to Gomez's car.

¶ 29    The parties stipulated to cell phone records that showed a call from Djurdjulov to Camacho around 3 a.m. on January 31, 2009, but no call near 1 a.m.

¶ 30    Gomez testified for the defense that he and Djurdjulov spent the evening of January 30, 2009, with friends, and around midnight, with Djurdjulov in the car, Gomez drove the friends home. A little before 1 a.m., Gomez dropped off one of the friends about a block away from the building that later caught fire. Djurdjulov got out of the car to urinate. They then went to the Santiagos' home, arriving around 1 a.m. Djurdjulov did not smell like gasoline, and he did not change his clothes at the Santiagos' home. Djurdjulov did not have a change of clothes with him. Gomez stayed in the car with Michael and Djurdjulov when Noel went into the liquor store on the trip around 3 a.m. Djurdjulov did not say anything to Michael or Gomez about burning a building. Djurdjulov, Gomez, and Michael all saw the news report about the fire, but neither Djurdjulov nor Gomez said anything when the report aired. Gomez also explained the cell phone records that showed multiple contacts between Gomez's phone and Djurdjulov's phone while Djurdjulov rode in Gomez's car between midnight and 1 a.m. on January 31, 2009. Gomez left his cell phone with his girlfriend, and he borrowed Djurdjulov's phone to send texts to his girlfriend, which she read on Gomez's phone.

¶ 31    During deliberations, the jurors requested the cell phone records, a map showing the cell phone towers, and a transcript of the questioning of Djurdjulov from March 10 to March 12, 2009. The court sent the requested materials to the jury. The jury found Djurdjulov guilty of the first degree murders of Ocampo and Fernandez.

¶ 32    The presentence investigation report showed that Djurdjulov, who turned 18 between the date of the fire and the date of questioning in March, worked at a grocery store, and after his arrest, he earned a G.E.D. in jail. Djurdjulov had one adjudication for unlawful use of a weapon, and he successfully completed his 18 months of probation on that charge.

¶ 33    The trial court sentenced Djurdjulov to two terms of 45 years in prison with the sentences to run consecutively. The court denied Djurdjulov's motion for a new trial and his motion to reconsider the sentence. Djurdjulov now appeals.

¶ 34                                      ANALYSIS

¶ 35    Djurdjulov raises three issues in this appeal. First, he contends that the trial court should have granted his motion to suppress the statements he made during the questioning at the police station from March 10 to March 12, 2009. Second, he contends that the trial court should have granted his motion for funds so that he could hire an expert on cell phone data. Third, he contends that the trial court erred by sentencing him to a term that amounts to life in prison. Different standards of review apply to the three issues.

¶ 36                              Motion to Suppress Statements

¶ 37    The trial court must exclude evidence of confessions that the defendant did not make voluntarily. *People v. Melock*, 149 Ill. 2d 423, 447 (1992). The court must consider all of the circumstances surrounding a statement to determine whether the defendant made the statement voluntarily. *Melock,* 149 Ill. 2d at 447. "Factors to be considered in making the determination include the age, education and intelligence of the accused, the duration of the questioning, and whether he received his constitutional rights or was subjected to any physical punishment." *Melock,* 149 Ill. 2d at 447. "The test of voluntariness is whether the statement was made freely, voluntarily and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he confessed." *People v. Clark*, 114 Ill. 2d 450, 457 (1986).

¶ 38    When this court reviews the trial court's ruling on a motion to suppress a confession, we defer to the trial court's factual findings, overturning them only when they are against the manifest weight of the evidence. *People v. Patterson*, 2014 IL 115102, ¶ 37. However, we review *de novo* the ruling on the ultimate question of whether the defendant confessed voluntarily. *Patterson*, 2014 IL 115102, ¶ 37.

¶ 39    The parties do not dispute the facts concerning the March interrogation. Police had probable cause to arrest Djurdjulov on another charge on March 10. The video accurately records the questioning and the extended time Djurdjulov spent alone in the interview room. Police allowed Djurdjulov to use the bathroom and sleep, police brought Djurdjulov sufficient food, and police did not beat or threaten to beat Djurdjulov. Djurdjulov was 18 years old at the time of the questioning, with average intelligence, and in good physical condition. Police read Djurdjulov his *Miranda* rights at the start of the interrogation, and Djurdjulov understood those rights. Police records showed several prior contacts with Djurdjulov, including an arrest and conviction for unlawful use of a weapon.

¶ 40    Djurdjulov emphasizes that detectives yelled at him frequently during the prolonged questioning. Detectives threatened that courts would sentence him to death if he did not tell them who set the fire, although state law precluded imposition of the death penalty because Djurdjulov was only 17 at the time of the offense. See 720 ILCS 5/9-1(b) (West 2008). Detectives further tricked Djurdjulov by telling him his "way out" was to say he saw someone else set the fire.

¶ 41    The length of the detention here counts as a factor making the interrogation somewhat coercive. See *People v. McGhee*, 154 Ill. App. 3d 232, 239-40 (1987). Also, we find the reference to the death penalty intimidating and deceptive. "While deception is not *per se* unlawful, it can contribute to the coerciveness of the interrogation and weigh against a finding of voluntariness." *Patterson*, 2014 IL 115102, ¶ 76. But "a brief reference to the death penalty will not render a statement involuntary when the statement merely illustrates the seriousness of

the crime and the defendant's will was not overborne as a result of the statement." *State v. Garner*, 614 N.W.2d 319, 327 (Neb. 2000).

¶ 42    The State points out that police accommodated Djurdjulov's physical needs and used no physical force. The detectives suggested possible explanations of the events and asked Djurdjulov to supply details of the offense, in accord with reasonable questioning practices. See *People v. Carrington*, 211 P.3d 617, 643 (Cal. 2009). Police made no promises to Djurdjulov when they suggested a way out. See *People v. Holloway*, 91 P.3d 164, 177 (Cal. 2004). We agree with the State that the questioning here "is better characterized as a 'dialogue or debate between suspect and police in which the police commented on the realities of [his] position and the courses of conduct open to [him]' (*People v. Andersen*, [161 Cal. Rptr. 707, 718 (Ct. App. 1980)]) than as a coercive interrogation." *Holloway*, 91 P.3d at 177-78. We find that the detectives did not overcome Djurdjulov's will. The trial court correctly held Djurdjulov's statements admissible.

¶ 43                                                    Expert Fees

¶ 44    Djurdjulov next contends that the trial court violated article I, section 8 of the Illinois Constitution (Ill. Const. 1970, art. I, § 8) and the sixth amendment to the United States Constitution (U.S. Const., amend. VI) when it denied his motion for fees so that he could hire an expert to analyze the cell phone records. See *People v. Lawson*, 163 Ill. 2d 187, 219-20 (1994). Djurdjulov admits that his counsel failed to include the issue in this motion for a new trial, but he contends that, because his counsel raised the constitutional issue at trial, he has not forfeited review of the issue. The State addresses this argument only under the doctrine of plain error.

¶ 45    "[C]onstitutional issues that were previously raised at trial and could be raised later in a postconviction petition are *not* subject to forfeiture on direct appeal ***. [Citation.] *** [W]hen, as here, a defendant fails to raise a constitutional issue in a posttrial motion but the issue was raised at trial and could be raised in a postconviction petition 'the interests in judicial economy favor addressing the issue on direct appeal rather than requiring defendant to raise it in a separate postconviction petition.' " (Emphasis in original.) *People v. Almond*, 2015 IL 113817, ¶ 54 (quoting *People v. Cregan*, 2014 IL 113600, ¶ 18). The defendant in *Almond* sought review of the trial court's ruling on a motion to suppress evidence. Although the defendant did not raise the issue in his posttrial motion, our supreme court did not review the issue under the doctrine of plain error. Instead, the *Almond* court applied the standards used for preserved issues on direct appeal. *Almond*, 2015 IL 113817, ¶ 55. Similarly, in *Cregan*, the defendant sought review of the trial court's ruling on a motion to suppress evidence. Although the defendant did not raise the issue in his posttrial motion, the *Cregan* court did not review the issue under the standards for plain error. Instead, the court applied the standards used for preserved issues on direct appeal. *Cregan*, 2014 IL 113600, ¶¶ 18-23.

¶ 46    We find that Djurdjulov has not forfeited review of the issue of whether the trial court violated his constitutional right to a fundamentally fair trial when the court denied his request for fees so that he could hire an expert to review the cell phone data. We review the issue under the standards for issues properly preserved for review, despite the failure of Djurdjulov's counsel to include the issue in the posttrial motion for a new trial. The abuse of discretion standard applies to the trial court's ruling on a motion for fees to pay to an expert witness. *In re T.W.*, 402 Ill. App. 3d 981, 986 (2010).

¶ 47    "[A] criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense." *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). Every defendant accused of a crime has a "fundamental right to summon witnesses in his behalf." *Lawson*, 163 Ill. 2d at 220. "[The right] should not be made to depend upon the financial circumstances of the defendant. *** [R]easonable funds should be made available to accuseds, in certain circumstances, in order to imbue the right with substance." *Lawson*, 163 Ill. 2d at 220. "[I]t is well established that a denial of funds to an indigent for the securing of expert witnesses in defense of criminal charges may violate constitutional protections." *Lawson*, 163 Ill. 2d at 220.

¶ 48    A defendant establishes a right to funds for an expert witness "where the defendant demonstrates that the expert services sought are necessary to prove a crucial issue in the case and where the defendant's financial inability to obtain his own expert will prejudice his case." *People v. Clankie*, 180 Ill. App. 3d 726, 730 (1989).

¶ 49    The State contends that Djurdjulov did not prove indigence. Djurdjulov testified that he owned no bank accounts, no car, no valuable items like electronics or jewelry, no home or land, no business, and no assets he could use to pay for an expert. The State offered no evidence to challenge the credibility of Djurdjulov's assertions about his assets.

¶ 50    A defendant needs to establish only his own indigence as part of the proof needed to show a right to fees. *Clankie*, 180 Ill. App. 3d at 730. He need not show the indigence of relatives or other persons he knows. Friends, relatives, or others who help with some of the costs of defense have not thereby committed themselves to paying all costs necessary for the defense. See *People v. Evans*, 271 Ill. App. 3d 495, 502 (1995). When a defendant shows indigence and the need for an expert, he has a right to fees "regardless of whether the indigent defendant receives assistance of counsel from a court-appointed attorney. [Citations.] It is the indigency of the defendant that matters ***, not who represents the defendant at trial." *T.W.*, 402 Ill. App. 3d at 991. The trial court abused its discretion when it relied on the payment of fees by Djurdjulov's aunt to private counsel as grounds for denying the indigent Djurdjulov the fees needed to retain an expert.

¶ 51    The State contends that we should affirm the conviction despite the court's error because Djurdjulov did not show that he needed an expert witness. *United States v. Durant*, 545 F.2d 823 (2d Cir. 1976), which our supreme court cited with approval in *Lawson*, 163 Ill. 2d at 229, provides useful guidance. Prosecutors accused Durant of bank robbery, and they intended to present testimony from a fingerprint expert. Durant sought funds so that he could hire an expert to examine the prints from the crime scene. The trial court denied the request, finding that defense counsel could protect Durant's rights by cross-examining the prosecution's expert. The expert testified that fingerprints found on the bank counter matched Durant's fingerprints. Two of the robbers identified Durant in court as their accomplice, but because of sentencing leniency they received for testifying against Durant, a finder of fact could have doubted their testimony. During deliberations, the jurors requested the fingerprint exhibits. The jury found Durant guilty of bank robbery.

¶ 52    The court of appeal noted that the applicable law required the State to pay for an expert for a defendant in a criminal trial only if the expert's "services [are] necessary to an adequate defense." (Internal quotation marks omitted.) *Durant*, 545 F.2d at 826. The *Durant* court said, " '[n]o standard can be arbitrarily articulated covering all circumstances under which an accused demonstrates his entitlement under the Act to services of experts to present an

adequate defense.' " *Durant*, 545 F.2d at 826 (quoting *United States v. Schultz*, 431 F.2d 907, 909 (8th Cir. 1970)). But the court adopted, as a guideline, the precept that the court should " 'authorize defense services when the defense attorney makes a timely request in circumstances in which a reasonable attorney would engage such services for a client having the independent financial means to pay for them.' " *Durant*, 545 F.2d at 827 (quoting *United States v. Bass*, 477 F.2d 723, 725 (9th Cir. 1973)).

¶ 53 The *Durant* court held:

" '[A]n adequate defense' must include preparation for cross-examination of a government expert as well as presentation of an expert defense witness. This does not mean that applications for expert assistance should be granted automatically, or that frivolous applications should be granted at all. But it does mean that the Act must not be emasculated by *** inappropriate construction.

*** Where the identification of the defendant as a culprit is contested, fingerprint evidence is likely to be pivotal. This was such a case. Both counsel in summation emphasized the fingerprint evidence. But defense counsel had to get along without his own expert. Had one been authorized, counsel might have been able to make several challenges. *** At the very least, an expert could have educated defense counsel as to the technicalities of the field to make cross-examination more effective.

*** We have no basis for accepting the Government's prediction that a defense expert's report would 'in all probability' have supported [the Government's expert]. In any event, the adversary system *** leaves such choices to the defense. ***

In sum, we believe that the judge should have granted the defense request for appointment of a fingerprint expert. Under the circumstances, we reverse the judgment of conviction and remand for a new trial. We have given serious consideration to merely remanding for appointment of an expert whose report could then be considered by the trial court or by us in deciding whether to grant a new trial. But we believe this misconceives the purpose of providing expert service to the defense. It is not to supply either the trial or appellate court with anything, but to furnish defense counsel expert information to use as he sees fit. It may be that such expert advice will prove to be of little or no assistance, but on this record we can hardly say that. Furthermore, even if the new trial ultimately proves wasteful because an appointed expert does not help the defense, none of the blame for the waste will rest with the defendant. Under the circumstances, we believe it appropriate to order a new trial, as was done in *United States v. Theriault*, [440 F.2d 713 (5th Cir. 1971)], *United States v. Schultz*, [431 F.2d 907], and, apparently, in *United States v. Bass*, [477 F.2d 723]." *Durant*, 545 F.2d at 827-29.

¶ 54 We find *Durant* persuasive. The cell phone records here formed a critical part of the evidence against Djurdjulov. The jury apparently considered the cell phone evidence especially significant, as it specifically requested the records and a map showing the locations of the towers relative to the fire and the other addresses mentioned at trial. The defense needed an expert at least to educate defense counsel about the technicalities of the field and to assist with the preparation of an effective cross-examination of Raschke. Even the police needed help understanding the records, as the officer who obtained the records said cell providers explained the records, which he found "quite confusing." The other witnesses against Djurdjulov, like the robbers who testified against Durant, had much to gain from testifying

against Djurdjulov. While Djurdjulov eventually gave a statement implicating himself as an accomplice, the prosecutor argued that the jury should not believe the statement, except insofar as it placed Djurdjulov at the scene of the fire with some idea that someone might start a fire there. The jury could have viewed Djurdjulov's statement, in the context of the extensive questioning, as his effort to explain the evidence the police described and not as a truthful statement at all. We find that the record supports the conclusion that the lack of an expert prejudiced Djurdjulov. See *T.W.*, 402 Ill. App. 3d at 992-93. Following *Durant*, we vacate the convictions and remand for a new trial.

¶ 55    The dissent argues that Djurdjulov failed to preserve a sufficient record to show that the trial court committed reversible error when it denied his motion for funds so he could retain an expert to analyze cell phone data. Djurdjulov filed with this court a record that included his motion for funds to hire an expert and the transcript of the hearing on the motion. The transcript showed that Djurdjulov testified that he had no assets. The State presented no contrary evidence. The court stated on the record its reasons for denying the motion. The dissent finds this record insufficient to preserve the issue for review because Djurdjulov did not later submit an affidavit or testify that he had not retained an expert. The dissent cites no case that requires such testimony from a defendant in a criminal case after the trial court has denied a motion for funds to retain an expert.

¶ 56    The extra hoop through which the dissent would require Djurdjulov to jump makes a significant difference for his rights. The dissent says that Djurdjulov can raise the constitutional issue in a postconviction petition, supported by an affidavit stating that he did not retain an expert. In a postconviction proceeding, Djurdjulov will bear the burden of showing a reasonable probability that the trial would have ended with a different result if the constitutional violation had not occurred. See *People v. Eddmonds*, 143 Ill. 2d 501, 510 (1991). If we review the issue on this direct appeal, and "it is established that an error of constitutional magnitude has occurred, the burden is on the one gaining advantage from the error, rather than the one claiming prejudice, to prove that the error did not contribute to the verdict but, rather, that it was harmless beyond a reasonable doubt." *People v. Childs*, 159 Ill. 2d 217, 228 (1994); see *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981). Thus, under the correct standard of review that the dissent seeks to avoid, if Djurdjulov has shown a constitutional error, the State has the burden of proving that the error was harmless beyond a reasonable doubt.

¶ 57    The trial court admitted that it had no basis for rejecting Djurdjulov's assertion that he needed an expert to help him counter Raschke's testimony. The trial court denied Djurdjulov the funds he needed based on speculation that Djurdjulov's relatives might have assets with which to pay an expert. But to qualify for funds needed to retain an expert, the defendant needs to show only his own indigence and not the indigence of all of his relatives. *Lawson*, 163 Ill. 2d at 220; *Clankie*, 180 Ill. App. 3d at 730. No case supports the trial court's ruling or the dissent's assertion that the trial court has discretion to deny a motion for funds based on speculation about the assets of a defendant's relatives. "[I]t is well established that a denial of funds to an indigent for the securing of expert witnesses in defense of criminal charges may violate constitutional protections." *Lawson*, 163 Ill. 2d at 220. Thus, Djurdjulov presented a sufficient record to show that the court committed an error of constitutional magnitude when it denied his motion for funds based on irrelevant speculation about his relatives' assets.

¶ 58    Because Djurdjulov raised the constitutional issue at trial, the failure to raise the issue in the motion for a new trial does not affect our standard of review. We must review the issue

under the standards for a direct appeal of a preserved issue and not as a matter of plain error. *Almond*, 2015 IL 113817, ¶¶ 54-55; *Cregan*, 2014 IL 113600, ¶¶ 18-23. Because the transcript shows that the trial court denied the motion for funds on the improper basis of speculation about the assets of Djurdjulov's relatives, the State must meet the burden of proving beyond a reasonable doubt that the error did not affect the result of the trial. *Wilkerson*, 87 Ill. 2d at 157.

¶ 59    The dissent characterizes the evidence against Djurdjulov as overwhelming and Raschke's testimony as less than critical to the State's case. For this argument, the dissent relies on confident assertions about which of a mass of contradictory statements from the witnesses and Djurdjulov the trier of fact must believe.

¶ 60    The dissent relies in part on the testimonies of Michael, LaSalle, and Quesada, who all changed their statements completely after police arrested Michael and Michael stood to gain a considerable advantage by testifying against Djurdjulov. Michael, LaSalle, and Quesada all testified that they lied to police, and after they changed the account they gave police, they lied to a defense investigator. A reasonable trier of fact could reject all of the testimony of Michael, LaSalle, and Quesada as lacking credibility. See *People v. Richmond*, 84 Ill. App. 3d 1017, 1019 (1980).

¶ 61    The dissent relies primarily on just one of the many statements Djurdjulov made during the 36 hours he spent in an interrogation room in March 2009. But triers of fact may find confessions elicited in coercive settings unreliable. "The credibility of a defendant's confession is to be weighed by the trier of fact, which may accept all, parts, or none of the confession." *People v. Wiley*, 205 Ill. 2d 212, 227 (2001). "The jury can still reject the confession, after considering all the circumstances concerning it." *People v. Oswalt*, 26 Ill. App. 3d 224, 226 (1975). Here, police kept Djurdjulov, a teenager, in custody for 36 hours, during which police used deception and intimidation to elicit statements from Djurdjulov. Djurdjulov made a number of statements. The State asked the jury to reject as unbelievable almost all aspects of almost all of the statements Djurdjulov made. But the State and the dissent now insist that we should find that part of one of the statements amounts to overwhelming evidence that Djurdjulov committed murder, even while the State and the dissent demand that we reject as unbelievable other parts of the same statement. We find that a reasonable trier of fact could disagree with the prosecution's tenuous inferences from the inconsistent statements made after a long period in custody.

¶ 62    No physical evidence tied Djurdjulov to the crime or the crime scene. No credible prosecution witness saw Djurdjulov near the murder scene. The only credible prosecution witness whose testimony placed Djurdjulov near the scene of the crime was Raschke, the cell phone expert. An expert who could challenge the credibility of Raschke's testimony could have made a critical difference in the result of the trial. The prosecution has not met its burden of proving that the trial court's error was harmless beyond a reasonable doubt. Following the reasoning of *Durant*, 545 F.2d at 827-29, we find that we must reverse the convictions and remand for a new trial because of the trial court's constitutional error of denying Djurdjulov's motion for the funds he needed to hire an expert to challenge Raschke's testimony.

¶ 63    Because we vacate the convictions, we need not address Djurdjulov's arguments about his sentences.

- 12 -

¶ 64                                    CONCLUSION

¶ 65       The State sufficiently showed that in 36 hours of detention starting on March 10, 2009, Djurdjulov voluntarily answered questions about his actions after midnight on January 31, 2009. The trial court denied Djurdjulov his right to present witnesses on his behalf when it denied his request for fees so that Djurdjulov could hire an expert to contest the prosecution's evidence concerning cell phone records. Accordingly, we vacate the convictions and remand for a new trial.

¶ 66       Vacated and remanded.

¶ 67       JUSTICE MASON, concurring in part and dissenting in part:

¶ 68       The majority properly rejects Djurdjulov's challenge to the denial of his motion to suppress, and I concur in that portion of the court's ruling. I respectfully part ways with the majority's decision to reverse Djurdjulov's convictions based on the trial court's denial of his motion to require the county to subsidize the fees of a cell phone expert. That decision was committed to the trial court's discretion, and under the circumstances, I find no abuse. And even if the trial court erred, given the overwhelming evidence against Djurdjulov, the error was harmless beyond a reasonable doubt. I would affirm Djurdjulov's convictions but, given the *de facto* life sentence he received for a crime committed while he was a minor, remand for a new sentencing hearing.

¶ 69       The majority addresses this issue, not under the rubric of plain error, but as a constitutional issue that cannot be forfeited on direct appeal. "We find that Djurdjulov has not forfeited review of the issue of whether the trial court violated his constitutional right to a fundamentally fair trial when the court denied his request for fees so that he could hire an expert to review the cell phone data." *Supra* ¶ 46. The presumption underlying this finding is that Djurdjulov did not, in fact, have the assistance of an expert in mounting his defense.

¶ 70       But the factual predicate to the existence of a constitutional deprivation cannot be ascertained from the record. After Djurdjulov's motion for expert witness fees was denied, the court held a series of status hearings. During several of those hearings, defense counsel requested that a trial date not be set because Djurdjulov's family was pursuing raising funds for the retention of Michael O'Kelly, the cell phone expert defense counsel had identified in the motion and preliminarily consulted with. Counsel never represented one way or the other whether the expert had, in fact, been retained but ultimately agreed to set the case for trial. It is certainly possible that defense counsel was forced to forgo retention of an expert because Djurdjulov's family could not afford it. Yet, it is equally plausible that an expert was, in fact, retained and was consulted to assist in the cross-examination of the State's expert, FBI agent Joseph Ashcake, which was extensive. Defense counsel could also have elected, as a matter of trial strategy, not to present an expert in Djurdjulov's case for any number of reasons, including the fact that the expert could not deny, as T-Mobile records showed, that Djurdjulov's cell phone connected to a cell tower in the vicinity of the fire twice around the time the fire was set. Because the record does not disclose whether defense counsel retained O'Kelly (or some other expert), we should not assume that they did not, which is necessary to the finding of a constitutional violation. See *People v. Mosley*, 2015 IL 115872, ¶ 11 (courts "decide constitutional questions only to the extent required by the issues in the case").

¶ 71 Courts often refrain from addressing certain errors on direct appeal, particularly those relating to trial strategy, because they are more properly the subject of a postconviction petition. See, *e.g.*, *Massaro v. United States*, 538 U.S. 500, 508 (2003) (recognizing a preference for collateral review for deciding ineffective assistance claims); *People v. Veach*, 2017 IL 120649, ¶ 46; *People v. Allen*, 2016 IL App (4th) 140137, ¶ 51. Chief among the reasons reviewing courts give for declining to address these issues is the insufficiency of the record. *People v. Bew*, 228 Ill. 2d 122, 135 (2008) (although record was inadequate to prove ineffective assistance of counsel on direct appeal, defendant could raise the issue in postconviction proceedings so the parties could "develop a factual record bearing precisely on the issue" (internal quotation marks omitted)); *Allen*, 2016 IL App (4th) 140137, ¶ 51 ("if [counsel's] trial tactics are to be the subject of scrutiny, then a record should be developed in which they can be scrutinized" (internal quotation marks omitted)); see also *People v. Brown*, 2014 IL App (1st) 122549, ¶ 41 (matters outside the record may not be raised on direct appeal but are properly addressed in a postconviction petition). If Djurdjulov later pursues a postconviction petition, in that context, he may be able to obtain an affidavit from his trial counsel establishing whether or not an expert was retained. But until that fact is established, resolution of the constitutional issue is premature. That a different legal standard will apply to a postconviction petition is no reason to overlook, as the majority does, deficiencies in the record precluding review of this issue.

¶ 72 If instead this issue is reviewed for plain error, as it should be, it is clear that Djurdjulov cannot prevail. It is beyond argument that Djurdjulov did not preserve this issue for appeal given that he (i) made no offer of proof at trial as to what the anticipated expert testimony would be (*People v. Peeples*, 155 Ill. 2d 422, 457-58 (1993); *People v. Pelo*, 404 Ill. App. 3d 839, 875 (2010)) and (ii) failed to include this issue in his posttrial motion (*People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010); *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988)). In the absence of plain error, failure to preserve the issue will result in forfeiture. *Enoch*, 122 Ill. 2d at 186-87. While the first step in a plain error analysis is usually a discussion of whether error exists (*People v. Walker*, 232 Ill. 2d 113, 124-25 (2009)), when it is clear that the claimed error could not have affected the outcome of the case, courts may bypass the "meaningless endeavor of determining whether error occurred." *People v. White*, 2011 IL 109689, ¶ 148. That is the case here. Wholly apart from Raschke's testimony, the evidence against Djurdjulov was, by any measure, overwhelming.

¶ 73 First, there are Djurdjulov's own words. The jury had the entirety of his recorded interview (both on video and transcribed) and portions were played during both trial and closing arguments. On multiple occasions during his interview, Djurdjulov admitted to police that he was in the vicinity of the scene of the fire. Although he initially denied knowing anything or being anywhere near the fire, Djurdjulov told police about his house being "bricked" earlier that evening, which he initially blamed on an ex-girlfriend. In a later interview, according to Djurdjulov, Franco Avila, another member of the Cobras, called Djurdjulov, told him he had heard about the bricking and that in retaliation, Avila planned to set fire to a house where members of the SGD lived, which Djurdjulov encouraged him to do. Then Avila called him after the fire to tell him he had done so using HEET, a highly combustible gasoline additive. When police confronted Djurdjulov with the fact that there were no calls to his cell phone from Avila's number after the fire, Djurdjulov then recalled that Avila had not called him after the fire but had relayed the information personally when the two met at a McDonald's. When

police confronted Djurdjulov with cell phone records that placed his phone in the vicinity of the fire around 1 a.m.,[1] Djurdjulov then claimed that he was there to retaliate for the bricking himself by throwing a bottle through the window of 3912 W. Argyle Street. But as he stood in the alley, he saw the building go up in flames and later saw Avila—who he knew was planning to set the fire—run out of the building with another person he did not know. Still later, Djurdjulov, continuing to blame Avila, placed himself at the scene as a lookout for Avila. Finally, Djurdjulov abandoned the effort to pin the fire on Avila and instead claimed that an individual he knew as "Rooster"—someone who was not a member of the Cobras—set the fire (for some inexplicable reason) and that Djurdjulov acted as a lookout. In this version, Djurdjulov told the police that he witnessed Rooster pouring gasoline from the second floor hallway down to the first floor (which was, in fact, how police later determined the fire started), even though Djurdjulov was outside the building and could not have seen what Rooster was doing inside. In short, the State did not need Raschke to place Djurdjulov at the scene; he did it himself.

¶ 74    Second, other substantial evidence more than satisfied the State's burden of proof. Earlier during the evening of January 30, Djurdjulov's sister called to tell him of the attack on their home. A call to 911 to report the fire was made at 1:10 a.m. Djurdjulov placed a call to his sister at 1:06 a.m., and the jury could reasonably have inferred that Djurdjulov called to tell her he had retaliated against the SGD by setting the fire. Multiple witnesses testified to the fact that Djurdjulov arrived at the Santiago brothers' apartment at around 1:30 a.m., reeking of gasoline, and that he ultimately changed into different clothes. While there, Djurdjulov expressed anger about the bricking of his house. Djurdjulov initially explained the gas smell claiming that he had spilled gas on himself while fueling his car,[2] but later that morning, when Michael Santiago said Djurdjulov still smelled like gas as they were waiting in Gomez's car, Djurdjulov said: "I messed up. I burned down a building." Later, at the Santiago's apartment, when a breaking news report about the fire was broadcast on television, Djurdjulov said, "[t]hat's what I did." Even Ulices Gomez, who was a witness for Djurdjulov, reinforced the State's proof that Djurdjulov had the motive and the opportunity to set the fire. Gomez testified that Djurdjulov was "upset" about the bricking of his house and admitted that "anybody" would want to retaliate. Gomez placed Djurdjulov in the vicinity of the fire when he recounted that before heading to the Santiago's apartment early that morning, they stopped in the alley by Jamal Hernandez's house—1½ blocks away from the scene of the fire—to get liquor to bring with them. Although Gomez's accounts were inconsistent, at one point he said Djurdjulov left to get the liquor while Gomez remained with his car.

¶ 75    Given the overwhelming evidence that placed Djurdjulov in the vicinity of the fire both before and after it was set, Raschke's cell phone analysis was not "critical" to the State's case, Djurdjulov's defense, or the jury's verdict. Raschke readily admitted that the location of Djurdjulov's cell phone in the vicinity of 3912 W. Argyle did not mean that Djurdjulov himself was there. Raschke also explained that he was not purporting to pinpoint the location of the phone at a particular address given that cell tower frequencies can range from one to two miles. Although Raschke's testimony was mentioned briefly in the State's closing argument, it was not mentioned at all in rebuttal. The primary focus of the State's closing and rebuttal

---

[1]The police did not need an expert to reach this conclusion.

[2]There was no evidence suggesting that Djurdjulov drove his own vehicle at any time that evening.

arguments was Djurdjulov's recorded interview and the multiple conflicting stories he gave to police, several of which placed him at the scene. And defense counsel in his argument admitted that Djurdjulov was "in the area" of the fire, thus underscoring the relative insignificance of Raschke's testimony.

¶ 76    The majority relies on the jury's request for the cell phone carriers' records and the map showing the location of the cell towers as proof that this evidence was "critical." This is not borne out by the record. The jury began its deliberations at 2:30 p.m. After the jury retired, the court and counsel noted that none of the many exhibits admitted at trial had been sent to the jury room. One-half hour into its deliberations, the jury sent out its request not only for the cell phone evidence, but also for Djurdjulov's recorded interview and Hernandez's address. Thus, the notion that the jury was focusing primarily on the cell phone information is incorrect. In response to the jury's request, the court stated: "That's all part of the stuff that should have gone back, right?" Both counsel agreed. Therefore, because the jurors had none of the exhibits they were entitled to review in reaching their verdict, we cannot ascribe any particular significance to the request for some of those exhibits, which, in any event, was not limited to the cell phone evidence.

¶ 77    Because Djurdjulov has failed to preserve this issue for review and because any error in the denial of his motion for expert witness fees was harmless beyond a reasonable doubt given the overwhelming evidence against him (*People v. Stechly*, 225 Ill. 2d 246, 304 (2007)), there is no need to reach the merits of Djurdjulov's claim of error.

¶ 78    But even on its merits, Djurdjulov's claim fails. As the majority recognizes, the trial court's denial of Djurdjulov's request for expert witness fees is reviewed for an abuse of discretion. *Supra* ¶ 46 (citing *In re T.W.*, 402 Ill. App. 3d 981, 986 (2010)). A trial court abuses its discretion only when its decision is "fanciful, arbitrary, or unreasonable to the degree that no reasonable person would agree with it." *People v. Ortega*, 209 Ill. 2d 354, 359 (2004); see *People v. Couch*, 387 Ill. App. 3d 437, 444 (2008) (court abuses its discretion when it acts "clearly against logic" and "without employing conscientious judgment" (internal quotation marks omitted)). The existence of discretion necessarily implies that there is no single correct answer, *i.e.*, reasonable judges may come to different conclusions. *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 31 (citing *People v. Witherspoon*, 379 Ill. App. 3d 298, 310 (2008) (upholding a trial court's finding under an abuse of discretion standard does not mean the opposite finding would be an abuse of discretion as long as "[b]oth findings could have been rationally defensible")).

¶ 79    Although the majority focuses exclusively on Djurdjulov's personal lack of resources to hire an expert, none of the cases cited by my colleagues involves the situation presented here: privately retained counsel seeking public funds to hire an expert. *Lawson*, 163 Ill. 2d at 225 (defendant was represented by appointed counsel); *Clankie*, 180 Ill. App. 3d at 727 (same); *Durant*, 545 F.2d at 824 (same); *Evans*, 271 Ill. App. 3d at 502 (defense counsel was acting on *pro bono* basis); *T.W.*, 402 Ill. App. 3d at 986 (same).

¶ 80    Other relevant factors could have prompted a reasonable trial judge to deny Djurdjulov's request. Djurdjulov's privately retained counsel filed an appearance for him on March 31, 2009, shortly before the indictment. For the next four years, Djurdjulov's family paid for two private lawyers to represent him. Djurdjulov filed his expert fee request on November 20, 2012. On several occasions, both before and after Djurdjulov's fee motion was denied in January 2013, both of his retained lawyers appeared in court on his behalf, although during

most hearings only one attorney argued. The State completed its discovery responses by February 2010, and defense counsel were well aware that the State intended to call Raschke as an expert witness. Yet counsel made no effort to interview Raschke despite the claim that his testimony was "crucial" to the State's case[3] and although the State offered to make him available. Under these circumstances, the trial judge was entitled to view with skepticism Djurdjulov's claim that (i) his family was out of money and (ii) a cell phone expert was "crucial" to his defense even though he had not bothered to interview the State's expert. Consequently, I cannot find that the denial of Djurdjulov's request constituted an abuse of discretion.

¶ 81       Because I believe that Djurdjulov's convictions should be affirmed, it is necessary to address his additional claim that his 90-year sentence is unconstitutional because it is a *de facto* life sentence imposed for crimes committed while he was a juvenile.

¶ 82       In *Miller v. Alabama*, 567 U.S. 460, 479 (2012), the Supreme Court held that the eighth amendment to the United States Constitution prohibits "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." Citing its earlier decisions in *Roper v. Simmons*, 543 U.S. 551, 578 (2005) (eighth amendment prohibits imposition of death penalty on juvenile offenders), and *Graham v. Florida*, 560 U.S. 48, 74 (2010) (eighth amendment prohibits imposition of life without parole on juvenile offender who did not commit homicide), *Miller* explained that juveniles are "constitutionally different from adults for purposes of sentencing" because of their lack of maturity, their susceptibility to negative influences, and the fact that their character is less well formed than that of adults, all of which render juveniles " 'less deserving of the most severe punishments.' " *Miller*, 567 U.S. at 471 (quoting *Graham*, 560 U.S. at 68).

¶ 83       Following the rationale of *Miller*, our supreme court in *People v. Reyes*, 2016 IL 119271, ¶ 8, held that a juvenile may not be sentenced to "a mandatory term of years that indisputably amount[s] to life imprisonment without the possibility of parole for a single offense or for offenses committed in a single course of conduct." (Internal quotation marks omitted.) *Reyes* explained that a mandatory term of years that amounts to a *de facto* life sentence without possibility of parole "has the same practical effect on a juvenile defendant's life as would an actual mandatory sentence of life without parole—in either situation, the juvenile will die in prison. *Miller* makes clear that a juvenile may not be sentenced to a mandatory, unsurvivable prison term without first considering in mitigation his youth, immaturity, and potential for rehabilitation." *Id.* ¶ 9; see also *People v. Nieto*, 2016 IL App (1st) 121604, ¶ 42 ("While we acknowledge that Illinois typically treats consecutive sentences as individual sentences and does not aggregate them for purposes of evaluating whether a sentence is excessive [citation], we believe a different analytical framework is called for in the context of consecutive sentences imposed for crimes committed by a juvenile. Given that defendant will not be

---

[3]Djurdjulov's motion for fees overstated the significance of Raschke's testimony. Djurdjulov argued that O'Kelly was needed "to rebut the State's allegation that defendant was connected to the crime scene based on data from his cell phone" and that the State took the position that the cell phone data placed "defendant in the vicinity of the arson." Raschke never testified to either point and was careful to state that he did not know "who had the phone" or that "this phone was at 3912 E. Argyle." And based on the wealth of other evidence that connected Djurdjulov to the arson, including his own statements, it is clear that the convictions did not hinge on Raschke's testimony.

released from prison until he is 94 years old, we find that he effectively received a sentence of natural life without parole.").

¶ 84    Djurdjulov's 90-year sentence was a product of the trial court's exercise of discretion. The 45-year sentence for each of the murders fell in the mid-range of available sentences (730 ILCS 5/5-4.5-20(a) (West 2008) (sentencing range for murder is 20 to 60 years' imprisonment absent any enhancements)), and the law requires that Djurdjulov's sentences be served consecutively. 730 ILCS 5/5-8-4(d)(1)(a) (West 2008) (consecutive sentences are mandatory where one of the offenses was a Class X or a Class 1 felony and the defendant inflicted severe bodily injury). And unlike other 90-year sentences eligible for day-for-day good time credit, which we have held do not constitute *de facto* life sentences (see *People v. Evans*, 2017 IL App (1st) 143562, ¶¶ 16, 18), Djurdjulov must serve the entirety of his sentence. 730 ILCS 5/3-6-3(a)(2)(i) (West 2016).

¶ 85    The circumstances of the crime were despicable: a fire set in a multi-unit building during the middle of the night when its residents were likely asleep; a horrendous crime in retaliation for the relatively minor insult of a bottle thrown through a window; the deaths of two individuals, including a pregnant woman; and serious injuries to several others, including a young girl and first responders. Djurdjulov's repeated efforts to blame others, his systematic lies to police, and his failure to express any remorse for his actions (when given the opportunity to speak in allocution at his sentencing, Djurdjulov responded, "I'm good") all weigh in favor of a sentence in excess of the minimum.[4] Had the fire been set a few days later (Djurdjulov turned 18 two days after the fire), we would have no occasion to second-guess the trial court's exercise of discretion. *Cf. People v. Harris*, 2016 IL App (1st) 141744, ¶ 86 (Mason, J., concurring in part and dissenting in part) (" 'Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. *** [H]owever, a line must be drawn. *** The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.' " (quoting *Roper*, 543 U.S. at 574)).

¶ 86    But it is equally true that the product of the combined consecutive sentences is a *de facto* life sentence. And courts have recognized that mandatory sentencing schemes such as firearm enhancements, truth-in-sentencing provisions, and mandatory consecutive sentences can have a disproportionate impact when they are applied to juveniles. *People v. Gipson*, 2015 IL App (1st) 122451, ¶¶ 73, 75-76 (52-year sentence for juvenile offender, while not a *de facto* life sentence, was "so wholly disproportionate that it shocks the moral sense of the community," particularly where mandatory firearm enhancement did not permit the court to give appropriate weight to defendant's youth). Although our legislature has recently passed legislation designed to ameliorate some of these effects (730 ILCS 5/5-4.5-105 (West 2016) (for juvenile offenders tried in adult court, court has discretion not to impose sentencing enhancements "based upon firearm possession, possession with personal discharge, or possession with personal discharge that proximately causes great bodily harm, permanent disability, permanent disfigurement, or death to another person")), others remain, including mandatory consecutive sentences.

---

[4]The trial court was not required to assume, as Djurdjulov argues, that he acted only as a lookout and to fashion his sentence accordingly. The jury rendered general verdicts on the murder counts, the State argued strenuously at trial that Djurdjulov personally set the fire, and substantial incriminating evidence supports that conclusion.

- 18 -

¶ 87        So the issue becomes whether Djurdjulov received the individualized consideration he was entitled to during sentencing that would warrant the sentence he received. We have found that a trial court's mention of a defendant's youth during a sentencing hearing does not necessarily indicate that the court afforded the defendant the individualized consideration he is entitled to under *Miller*. *Nieto*, 2016 IL App (1st) 121604, ¶ 56 (remanding for resentencing so that trial court could consider the characteristics of defendant's youth "through the lenses of *Miller*"); *People v. Buffer*, 2017 IL App (1st) 142931, ¶ 63 (*de facto* life sentence imposed on juvenile offender was unconstitutional where "although the trial court exercised discretion in imposing the petitioner's sentence, nothing in the record supports the State's position that the court's reasoning comported with the juvenile sentencing factors recited in *Roper*, *Graham*, [and] *Miller*"); see also *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016) ("*Miller*, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of the distinctive attributes of youth." (Internal quotation marks omitted.)). And the record here does not disclose whether there are any characteristics, unique to Djurdjulov, which would counsel against the length of the sentence imposed. See *People v. Parr*, 130 Ill. App. 2d 212, 221 (1970) ("The burden of presenting mitigating circumstances and making a substantial showing of evidence in mitigation rests upon the defendant."). If Djurdjulov desires the benefit of an individualized sentencing hearing, then it is incumbent on him to provide the court with the information that will allow the fashioning of an individualized sentence.

¶ 88        I would vacate Djurdjulov's 90-year sentence and remand to the trial court for resentencing.